TRI–STATE MOTOR TRANSIT CO., A
Delaware Corporation, Plaintiff,

v.

The UNITED STATES, Defendant.

Nos. 94–347C, 94–450C, 95–705C.

United States Court of Federal Claims.

Nov. 5, 1997.

John Robert Bagileo, Washington, DC, attorney of record for plaintiff. Bagileo, Silverberg & Goldman, L.L.P., of counsel.

Agnes M. Brown, Washington, DC, Department of Justice, with whom was Assistant Attorney General Frank W. Hunger, for defendant.

## OPINION

HARKINS, Senior Judge.

This case is before the court on cross-motions for summary judgment. Jurisdiction is under the Tucker Act, based on express contracts with the United States. 28 U.S.C. § 1491(a)(1).

Plaintiff, Tri–State Motor Transit Company (TSMT), is a motor common carrier that, during the relevant period 1989–94, was subject to regulation by the Interstate Commerce Commission (ICC).[1] TSMT has been

---

1. Effective Jan. 1, 1996, the ICC was abolished and its regulatory authority was transferred to the Surface Transportation Board, an independent agency within the Department of Transpor-

a common carrier for more than 20 years. TSMT's traffic manager states its total operating revenue (government and non-government business) in 1994 was approximately $76 million. In that year, there were approximately 17,856 shipments for the United States Government, which produced approximately $32 million in revenue.

TSMT provides transportation services to government agencies through separate contracts. This summary judgment proceeding involves only "spot movement" contracts to transport property of the Army, Navy, Marines Corps, and the Coast Guard. A "spot movement" is a simple transaction whose financial value rarely exceeds $20,000. Each of the "spot movements" in this proceeding is a one-time arrangement for movement of property from one location to another within the continental United States (CONUS).

Government needs for spot movement transportation services historically have involved a multitude of transactions daily, and, over time, special procedures have been developed for this type of business. Procedures for contract formation, payment, and administrative review of claims are unique. Spot movement contracts are expressly exempt from the Federal Acquisition Regulations (FAR) and are not subject to the Comptroller General's bid protest jurisdiction under the Competition in Contracting Act. A spot movement is not subject to the Contract Disputes Act (CDA).[2]

This summary judgment proceeding involves TSMT's claims in three related dockets: No. 94–347C, No. 94–450C and No. 95–705C. The claims involve 4,200 spot movements, for which services TSMT has submitted invoices to the agency involved, and has been paid the amount on the invoice. The invoices and the payments for 4,199 spot movements were based on "tenders" filed with the DOD. TSMT asserts that tariffs filed with the ICC apply and claims additional compensation on each shipment that is calculated by application of the ICC tariffs. There are a total 4,200 spot movement contracts in dispute. In these three related dockets, TSMT claims additional amounts that total $6,539,478.79.

In order to isolate the applicable rate issue, and to permit early resolution of TSMT's claims for additional compensation, thirteen representative claims were selected for detailed analysis. On the 13 representative claims, defendant on the basis of tenders to DOD has paid $57,225.70. TSMT on the basis of ICC tariffs claims an additional $48,294.10 is owed.

The special procedure adopted in these three related dockets has been protracted and complex. The first complaint was filed on May 26, 1994; amendments to the complaints were filed to February 2, 1996. The special procedure ultimately involved Phases I through V, and covered the period May 26, 1994, through August 25, 1997.

The motion papers are voluminous. They consist of 32 motions, responses and replies filed by the parties under summary judgment rules, most of which include multiple page exhibits. There are 13 related orders, one transcript of oral argument, and one pretrial conference order. The exhibits include five ICC TSMT tariffs, 16 TSMT tenders filed with DOD, and five DOD publications.[3]

## I

### A. Statutes

Plaintiff's claims in the three dockets involved in the special procedure relate to spot movement shipments in 1991 and 1992. During those years, the ICC had jurisdiction over transportation by motor carrier, and the procurement of that transportation, in interstate movements of property, intrastate movements of property, and "to the extent

---

tation. Pub.L. No. 104–88, 109 Stat. 803, Dec. 29, 1995.

**2.** *See, generally, Dalton v. Sherwood Van Lines, Inc.,* 50 F.3d 1014, 1019 (Fed.Cir.1995).

**3.** Defense Traffic Management Regulation (DTMR), dated 31 July 1986; Department of

Defense Instructions for Use of MT Form 364–R Standard Tender of Freight Services editions issued in 1986, 1989 and 1991; and Military Freight Traffic Rules Publication No. IA, issued May 1, 1989. Appendix A to this opinion describes Phases I–V and shows descriptive lists of the applicable summary judgment motion papers.

the transportation is in the United States," in movements to a territory or possession, through a foreign country, or to a foreign country. This general grant of jurisdiction to the ICC is qualified by other provisions in Subchapter II, Motor Carrier Transportation, and by other provisions of law.[4]

Motor common carriers subject to the ICC are required to establish rates and classifications for transportation they provide and rules and practices relating to that transportation or service.[5] Rates that apply to transportation services for the United States Government are subject to special statutory treatment.

The statutes that apply to plaintiff's spot movements in 1991–92, and to ICC regulation of special circumstances relative to rates for government traffic, presently are found in 49 U.S.C. § 10721 (1994).[6]

Section 10721, Government traffic, includes the following provisions:

(a)(1) Except as provided in this section, the full applicable commercial rate shall be paid for transportation for the United States Government by a common carrier providing transportation or service subject to the jurisdiction of the Interstate Commerce Commission under this subtitle. Section 3709 of the Revised Statutes (41 U.S.C. § 5) does not apply when transportation for the United States Government can be obtained from a common carrier lawfully operating in the area where the transportation will be provided. When prescribing rates for transportation or service by those common carriers, the Commission shall consider increased revenues those carriers receive under this subsection to reflect those increases in appropriate readjustments of their rates.

\*　　\*　　\*　　\*　　\*　　\*

(b)(1) A common carrier providing transportation subject to the jurisdiction of the Commission under subchapter I, II, or III of chapter 105 of this title may transport individuals for the United States Government without charge or at reduced rates. The carriers may transport custom inspectors and immigration officers without charge. A common carrier providing transportation or service subject to the jurisdiction of the Commission under chapter 105 of this title shall provide transportation for the United States Postal Service under chapters 50 and 52 of title 39, and may transport property for the United States Government, a State, or municipal government without charge or at reduced rates; except that any rates for the transportation of household goods for the United States Government shall not be predatory.

(2) Unless a carrier is advised by the United States Government that disclosure of a quotation or tender of a rate established under paragraph (1) of this subsection for transportation provided to the United States Government would endanger the national security, the carrier shall file the quoted or tendered rate, including a retroactive rate made after the transportation has been provided, concurrently, with the Commission and the department, agency, or instrumentality of the United States Government for which the quotation or tender was made or for which the proposed transportation is to be provided. A carrier may quote or tender a rate established under an agreement made and approved under section 10706 of this title, but the exemption from the antitrust laws provided by that section applies only when the filing requirements of this paragraph are met.

\*　　\*　　\*　　\*　　\*　　\*

---

4.  49 U.S.C. § 10521(a). *See also* historical and revision notes following § 10521.

5.  49 U.S.C. § 10702(a). Additional requirements, applicable to motor contract carriers (subsection 10702(b) and (c)), or authority to establish through routes (section 10703), are not relevant to plaintiff's claims.

6.  The structure of 49 U.S.C. relative to rates for government traffic is: 49 U.S.C., Subtitle IV—Interstate Commerce; Chapter 103—Interstate Commerce Commission; Chapter 105—Jurisdiction, Subchapter II, Motor Carrier Transportation; Chapter 107—Rates, Tariffs and Valuations, Subchapter II, Special Circumstances § 10721, Subchapter III—Limitations § 10741, and Subchapter IV, Tariffs § 10761.

The structure, phraseology, and subject matter of the provisions applicable to ICC jurisdiction and to the rates and classification requirements for motor common carriers embody economic concepts, regulatory objectives, and administrative and judicial precedents that developed and were applied during the period February 4, 1887, (ICC created) to January 1, 1996, (ICC abolished).[7] These provisions reflect the multitude of statutory amendments that dealt with regulation of the transportation services that constitute commerce in and among the various states, territories or possessions, and through or to foreign countries.

The purpose of the 1887 Act to regulate commerce was to stop and control discriminatory and destructive business practices in the railroad industry. Over the years, the jurisdiction of the ICC over regulation of the railroads was expanded;[8] its jurisdiction was enlarged to include other modes of carriage, oil pipe lines,[9] motor carriers,[10] and extensive revisions of policies and objectives were made in 1920,[11] 1940,[12] and 1958.[13] The Motor Carrier Act of 1980,[14] and the Household Goods Transportation Act of 1980,[15] revised motor carrier regulation to reflect needs and realities of the 1980's, established a Motor Carrier Rate Making Study Commission to study the rate making process, and required

Congressional oversight hearings for the first 5 years after enactment. The transportation laws have been restructured with changes in text "for clarity and to eliminate redundancy," in 1978, 1983, and 1994, codifications.[16] Changes of this frequency and magnitude reduce to an arcane melange the statutory phraseology and structure that apply to 1991–92 spot movements.

Throughout the period of ICC transportation regulation, however, two dominant principles have been constant. First, all ICC controls over covered common carriers are designed to prevent discrimination against, or favoritism toward, shippers, including the United States Government as a shipper, in rates, routes and classifications. Second, there is a special exception to the prohibition against discrimination or favoritism: a carrier may agree with an agency of the United States Government to provide transportation services for free or at a reduced rate, with different routes or classifications. Both of these principles are reflected in the terms of 49 U.S.C. § 10721.

Section 10721(a)(1) embodies the elements developed by the ICC in the regulation of the modes of transportation subject to its jurisdiction.[17] ICC authority over common carri-

**7.** An act to regulate commerce, Feb. 4, 1887, ch. 104, Sec. 11, 24 Stat. 379, 383. In 1940, the title to "An act to regulate commerce," as amended, was changed to "Interstate Commerce Act" (ICA) to reflect usage that had developed by 1922, see 42 Stat. 827. ICC Termination Act of 1995, Pub.L. No. 104–88 Dec. 29, 1995, 109 Stat. 803, 804. West, Popular Names, lists 118 Acts that amend the ICA.

**8.** Elkins Act, Feb. 19, 1903, ch. 708, 32 Stat. 847 (Tariff on file established as only lawful rate); Mann–Elkins Act, June 18, 1910, ch. 309, 36 Stat. 539 (ICC empowered to prevent rate changes unless it determined the changes were just and reasonable).

**9.** Hepburn Act, June 29, 1906, ch. 3591, 34 Stat. 584

**10.** Motor Carrier Act, 1935, 74th Cong. ch. 498, Aug. 9, 1935, 49 Stat. 583.

**11.** Transportation Act of 1920, Feb. 28, 1920, ch. 91, 41 Stat. 456.

**12.** Transportation Act of 1940, Pub.L. No. 785, Sept. 18, 1940, ch. 722, 54 Stat. 898.

**13.** Transportation Act of 1958, Pub.L. No. 85–625, Aug. 12, 1958, 72 Stat. 568.

**14.** Pub.L. No. 96–296, July 1, 1980, 94 Stat. 793, 806

**15.** Pub.L. No. 96–454, Oct. 15, 1980, 94 Stat. 2011

**16.** Pub.L. No. 95–473, Oct. 17, 1978, 92 Stat. 1337; Pub.L. No. 97–449, Jan. 12, 1983, 96 Stat. 2413; and Pub.L. No. 103–272, July 5, 1994, 108 Stat. 745. See Revision Notes under 48 U.S.C. § 10721 (1994). Titles 31 and 49 of the United States Code have been revised, codified and enacted into positive law pursuant to 2 U.S.C. § 285 (1994).

**17.** ICC jurisdiction over common carriers in 1991–92 included: railroads, including express and sleeping car companies, electric railways, electric oil and chemical pipelines, motor vehicles, household goods carriers and freight for-

ers stems from the economic problems that arose from abuses that occurred in the railroad industry in the decades that preceded 1887. Additional economic problems that developed subsequently reshaped government transportation policy.

In 1887, the railroad abuses included financial manipulation in railroad construction, discriminatory practices in rate making, preferences to favored shippers and penalties imposed on those not considered favored shippers.[18] The 1887 Act prohibited and made unlawful every unjust and unreasonable charge for railroad transportation services. The Act, among its other provisions, prohibited and made unlawful special rates to a shipper, rebates, drawbacks and other devices, denied a carrier any right to charge a higher rate for a shorter rather than a longer haul over the same route under similar circumstances,[19] prohibited undue preferences to persons, localities, and traffic,[20] and required schedules of rates to be published.[21]

The economic problems in 1935, on the other hand, came from a perceived threat to the regulated transportation industry by the competition presented by unregulated highway motor carriers. The Senate Interstate Commerce Committee in its report on the bill ultimately enacted noted that the extraordinary growth of highway transportation had produced conditions where motor carriers for hire are engaged in intensive competition with each other and with railroads and water carriers. This resulted in chaotic transportation conditions that are not satisfactory to investors, labor, shippers, or the carriers themselves. The report concludes:

"The competitive struggle is to a large extent unequal and unfair, inasmuch as the railroads are comprehensively regulated, the water carriers are regulated in lesser degree, and the interstate motor carriers are scarcely regulated at all." [22]

Inasmuch as interstate motor carriers were not subject to regulation as common carriers, one difficulty in dealing with competition from motor carriers had been the collection of the comprehensive body of data that was essential to regulation in the public interest. This difficulty was overcome by information made available in two investigations by the ICC, and in reports by the Federal Coordinator of Transportation.[23]

The bill (S.1629, 74th Cong.) was described as a part of a complete and coordinated program of legislation recommended by the Federal Coordinator of Transportation. Senate Report No. 482 stated the legislation was essential to preservation of then existing ICC regulatory controls:

The motor-carrier industry has had a loose form of Federal regulation for more than a year under the operation of National Recovery Administration codes approved by the President, but these codes are admittedly inadequate to bring about necessary reforms. The railroads seek relaxation of their regulation but mainly because their competitors are unregulated. They concede the necessity in their own interest and in that of the public for preserving in essence the present Federal regulation of that industry.

Motor carriers, as a result of the 1935 legislation, were placed under the regulatory panoply that the ICC had developed to pre-

warders, steamship lines controlled by railroads, and other water carriers.

18. There are numerous treatises that deal with the origin of the ICA and development of railroad regulation under the ICC. *See, e.g., Isaiah Leo Sharpman,* THE INTERSTATE COMMERCE COMMISSION: A STUDY OF ADMINISTRATIVE LAW AND PROCEDURE, PART ONE, LEGISLATIVE BASIS (The Commonwealth Fund 1931).

19. Section 2. A rebate is the return by the carrier of part of the rate charged to the shipper; a drawback is payment by the carrier of part of the rate the carrier charged another shipper; the

long-and-short haul clause was amended in the Mann–Elkins Act.

20. Section 3.

21. Section 6.

22. S.Rep. No. 482, 74th Cong., 1st Sess., at 2–3 (1935).

23. ICC Commissioner Joseph B. Eastman: Regulation of Railroads (S.Doc. No. 119, 73rd Cong.2d Sess.(1934)); Regulation of Transportation Agencies (S.Doc. No. 152, 73rd Cong.2d Sess.(1934)); Report of Federal Coordinator of

vent discrimination and favoritism with respect to shippers, including the United States as a shipper. This body of law is embodied in the language of 49 U.S.C. § 10721(a)(1).[24]

The body of law applicable to the special exception to the regulatory prohibition against discriminating and favoritism that applies to agreements for the carriage of government property is embodied in the language of 49 U.S.C. § 10721(b)(1). The structure, phraseology and subject matter of the provisions that apply to the special exception for agreements with the government for transportation services also reflect a multitude of statutory amendments and restructuring that occurred during the period February 4, 1887, to January 1, 1996. In addition to agreements for the carriage, storage or handling of United States Government property, the statutory developments included exceptions that applied to municipal governments, transportation for charitable purposes, transportation to or from fairs and expositions, free transportation for carriers' officers and employees and exchange with other carriers of passes or tickets for carriers' officers and employers, free carriage for destitute and homeless persons transported by charitable societies, and free or reduced rates to ministers, and for inmates of homes for disabled veterans or orphans under arrangements with the boards of managers of said homes.[25] Special statutory provisions applied to transportation of mail and to transportation of military household goods.[26]

The ICA, from its inception in 1887 and at all times thereafter, authorized common carriers subject to the jurisdiction of the ICC to agree to transport property of the United States without charge or at reduced rates. In 1935, motor common carriers were made subject to ICC tariff filing provisions, and to the prohibitions against deviations from the specified rates and charges. These characteristics of regulated common carriers, however, were subject to the exception: "Provided, That the provisions of Sections 1(7) and 22(1) of part I shall apply to common carriers by motor vehicles subject to this part." [27] This proviso in the 1935 statute authorized motor common carriers to agree to transport property of the United States for free or at reduced rates.

In 1940, major revisions were made in the structure of the ICA, in addition to adoption of the short title "Interstate Commerce Act," for legislation that had developed under the "Act to regulate commerce," as amended. The Transportation Act of 1940 divided the ICA into three titles: Title I, Amendments to Existing Law; Title II, Regulation of Water Carriers in Interstate and Foreign Commerce; and Title III, Miscellaneous.[28]

Transportation, 1934 (H.R.Doc. No. 89, 74th Cong., 1st Sess.(1935)).

**24.** The elements of ICC regulation of motor carriers that apply to plaintiff's spot movements in the 1991–92 period include: 49 U.S.C. § 10521, General jurisdiction; § 10525, Exempt motor carrier transportation entirely in one state; § 10701 Standards for rates, classifications, through routes, rules, and practices; § 10702 Authority for carriers to establish rates, classifications, rules and practices; § 10703 Authority for carriers to establish through routes; § 10704, Authority and criteria: rates, classifications, rules, and practices prescribed by the ICC; § 10741 Prohibition against discrimination by common carriers; § 10761, Transportation prohibited without a tariff.

**25.** ICA, 24 Stat. 379, 387 (1887); ICA Amendments, 25 Stat. 855, 862 (1889). Provisions applicable to Special Passenger Rates were codified at 49 U.S.C. § 10722 (1994); provisions applicable to charitable purposes were codified at 49 U.S.C. § 10723 (1994).

**26.** Transportation Act of 1940, 54 Stat. 898, 954 (1940); Household Goods Transportation Act of 1980, Pub.L. No. 96–454, 94 Stat.2011 (1980).

**27.** Motor Carrier Act, 1935, § 217(b), 49 Stat. 543. The ICA, as amended to Aug. 9, 1935, was designated Part I; a further amendment added Part II to the ICA, to be cited as the "Motor Carrier Act, 1935." ICA Part II included §§ 201–227.

**28.** Pub.L. No. 785, Sept. 18, 1940, ch. 722, 54 Stat. 898. Title I, § 1, changed the short title and declared a new National Transportation Policy (54 Stat. 899); §§ 2–14 amended ICA §§ 1–27, those sections were designated Part I of the ICA; § 15 amended § 201 of the ICA, as amended, designated a new Part II of the ICA (54 Stat. 919) and §§ 16–26 amended ICA §§ 202–228; § 27 amended ICA § 201 as amended, to add as Part III of the ICA new sections 301–323; (54 Stat 929). Section 217(b) was amended "by striking out '22(1)' and inserting in lieu thereof '22'." (54 Stat. 925). ICA § 322(a) was amended to continue ICC authority over rates, contracts and agreements, classifications, rules and

A revised statutory authority was contained in Title III, Part II—Rates on Government Traffic. Section 321(a) provided, in part:

Sec. 321. (a) Notwithstanding any other provision of law, but subject to the provisions of sections 1(7) and 22 of the Interstate Commerce Act, as amended, the full applicable commercial rates, fares, or charges shall be paid for transportation by any common carrier subject to such Act of any persons or property for the United States, or on its behalf, except that the foregoing provision shall not apply to the transportation of military or naval property of the United States moving for military or naval and not for civil use or to the transportation of members of the military or naval forces of the United States (or of property of such members) when such members are traveling on official duty; * * * *Provided further*, That section 3709, Revised Statutes (U.S.C., 1934 edition, title 41, sec. 5), shall not hereafter be construed as requiring advertising for bids in connection with the procurement of transportation services when the services required can be procured from any common carrier lawfully operating in the territory where such services are to be performed. 54 Stat. 954.

In 1945, the statute was amended to strike the language in Section 321(a) that excepted transportation of military or naval property moving for military or naval and not for civil use.[29] After the 1945 amendment, the statute relating to Rates on Government Traffic, provided, in part:

Sec. 321 (a) Notwithstanding any other provision of law, but subject to the provisions of sections 1(7) and 22 of the Interstate Commerce Act, as amended, the full applicable commercial rates, fares or charges shall be paid for transportation by any common carrier subject to such Act of

any persons or property for the United States, or on its behalf, * * * *Provided further*, That section 3709, Revised Statutes (U.S.C., 1934 edition, title 41, sec. 5), shall not hereafter be construed as requiring advertising for bids in connection with the procurement of transportation services when the services required can be procured from any common carrier lawfully operating in the territory where such services are to be performed. 59 Stat. 607.

The 1945 amendment also added a Section 3 that authorized the ICC to make readjustments to carriers' rates. Section 3 provides:

Sec. 3. The Interstate Commerce Commission, in the exercise of its power to prescribe just and reasonable rates, fares, and charges, shall give due consideration to the increased revenues which carriers will receive as a result of the enactment of this Act, so that such increased revenues will be reflected in appropriate readjustments in rates, fares, and charges to shippers. 59 Stat. 607.

As a result of the 1940 and 1945 amendments, transportation for government agencies continued to be excepted from the prohibitions against discrimination in the ICA and the advertised bidding requirement was not required when transportation services could be procured from common carriers lawfully operating in the territory. Motor common carriers continued to be authorized to agree to transport property of the United States without charge or at reduced rates. Concurrently, ICC's regulatory responsibilities over rates, fares and charges continued and were kept separate from such excepted agreements between motor common carriers and the Government as a shipper.

In addition to the legislation that extended common carrier status to motor carrier transportation, the statutory structure set up a system for accelerated payment to carriers for transportation services provided to gov-

regulations found to be inconsistent with the national transportation policy. (54 Stat. 951). Title II, Regulation of Water Carriers in Interstate and Foreign Commerce, is contained in ICA Part II, as amended. Title III, Miscellaneous (54 Stat. 952) contains a Part I, Investigation of Various Modes of Transportation (54 Stat. 952–854); a Part II, Rates on Government Traffic,

§§ 321 and 322 (54 Stat. 954–955); and a Part III, Amendments to Reconstruction Finance Corporation Act.

29. An Act to Amend Section 321 of Title III, Part II, Transportation Act of 1940, with respect to the movement of Government Traffic. Pub.L. No. 256, Dec. 12, 1945, 59 Stat. 606, 607.

ernment agencies, and a mechanism for resolving disputes that arose from transactions With those agencies. The statutory structure for payment prior to audit or settlement by the General Accounting Office (GAO), and the right of the government to deduct the amount of any overpayment to a carrier, originated in Section 322 of the Transportation Act of 1940. The administrative procedures have been refined and enlarged in statutory amendments to Section 322 in 1958, 1972, and 1975.

In 1991–92, the administrative structure was defined in 31 U.S.C. §§ 3726 and 3728. Section 3726, Payment for transportation, includes the following provisions:

(a) A carrier or freight forwarder presenting a bill for transporting an individual or property for the United States Government may be paid before the Administrator of General Services conducts an audit, in accordance with regulations that the Administrator shall prescribe.

\* \* \* \* \* \*

(b) Not later than 3 years (excluding time of war) after the time a bill is paid, the Government may deduct from an amount subsequently due a carrier or freight forwarder an amount paid on the bill that was greater than the rate allowed under—

(1) a lawful tariff on file with the Interstate Commerce Commission, the Secretary of Transportation, with respect to foreign air transportation (as defined in section 40102(a) of title 49), the Federal Maritime Commission, or a State transportation authority; or

(2) sections 10721–10724 of title 49 or an equivalent arrangement or an exemption.

\* \* \* \* \* \*

(e) The Administrator may delegate any authority conferred by this section to another agency or agencies if the Administrator determines that such a delegation would be cost-effective or otherwise in the public interest.

(f) Under regulations the head of an agency prescribes that conform with standards the Secretary of the Treasury and

the Comptroller General prescribe jointly, a bill under the section may be paid before the transportation is completed notwithstanding section 3324 of this title when a carrier or freight forwarder issues the usual document for the transportation. Payment for transportation ordered but not provided may be recovered by deduction or other means.

(g)(1) A carrier or freight forwarder may request the Comptroller General to review the action of the Administrator if the request is received not later than 6 months (excluding time of war) after the Administrator acts or within the time stated in subsection (a) of this section, whichever is later.

(2) This section does not prevent the Comptroller General from conducting an audit under chapter 35 of this title.

Section 3728, Set off against judgment, includes the following provisions:

(a) The Comptroller General shall withhold paying that part of a judgment against the United States Government presented to the Comptroller General that is equal to a debt the plaintiff owes the Government.

\* \* \* \* \* \*

(c) If the Government loses a civil action to recover a debt or recovers less than the amount the Comptroller General withholds under this section, the Comptroller General shall pay the plaintiff the balance and interest of 6 percent for the time the money is withheld.

In the Transportation Act of 1940, Section 322 was limited to the right to deduct overpayments to a common carrier made prior to audit. In 1958, Section 322 was amended to change "overpayment to" to "overcharges by", and a new sentence was added to define the new term. Overcharges, as so defined, were:

"The term 'overcharges' shall be deemed to mean charges for transportation services in excess of those applicable thereto under the tariffs lawfully on file with the Interstate Commerce Commission and the Civil Aeronautics Board and charges in

excess of those applicable thereto under rates, fares, and charges established pursuant to section 22 of the Interstate Commerce Act.....

The provisions of amended Section 322 (then at 49 U.S.C. § 66) applied only to transportation performed and paid for subsequent to the effective date of the 1958 Act.[30]

In 1972, Section 322 (then at 49 U.S.C. § 66) of the Transportation Act of 1940, as amended, was further amended to authorize the "head of a Government agency" (as defined) in conformity with standards promulgated jointly by the Secretary of the Treasury and the Comptroller General, to prescribe regulations which permitted bills for transportation services furnished to the United States, to be paid "in advance of completion of the services". The Term "overcharges" in Section 322, as amended, was defined:

> The term 'overcharges' shall be deemed to mean charges for transportation services in excess of those applicable thereto under tariffs lawfully on file with the Interstate Commerce Commission, the Civil Aeronautics Board, the Federal Maritime Commission, and any State transportation regulatory agency, and charges in excess of those applicable thereto under rates, fares, and charges established pursuant to section 22 of the Interstate Commerce Act, as amended, or other equivalent contract, arrangement, or exemption from regulation".[31]

In 1975, pursuant to the General Accounting Office Act of 1974, Section 322 of the Transportation Act of 1940, as amended, was further amended to transfer auditing functions, relative to payments for transportation services for the United States prior to audit, to the General Services Administration (GSA). The authority of the GAO to make audits pursuant to 31 U.S.C. §§ 41 and 65 was not affected, and the Comptroller General could review GSA's actions on requests of the carriers involved. The effective date of

the transfer of functions and personnel was to be as mutually determined by the Comptroller General and the GSA Administrator, but not to be earlier than October 1, 1975, or later than September 30, 1976.[32]

Statutes applicable to the procedure for accelerated payments prior to audit, the mechanism for resolving disputes, and the government's right to deduct for overcharges, are embodied in 31 U.S.C. § 3726 (1994). Under these statutes, the spot movements plaintiff made in 1991–92 were subject to audit by GSA, with a continuing right to request to the Comptroller General to review a GSA determination. The GSA audits and the Comptroller General's review could involve, either (1) tariffs filed with the ICC, or (2) agreements made by a carrier, under regulations promulgated by the government agency involved, for transportation services provided without charge or at reduced rates. Only agency regulations, administrative rulings and judicial precedents in existence in 1991–92 are relevant to plaintiff's claims.

Statutes of limitations in the ICA on actions by and against common carriers have varied over time. In 1887, Section 16 of the Act authorized proceedings in the circuit courts, and appeals to the Supreme Court when a case involved $2,000 or more, for violations of the Act or refusal to obey an ICC order. Section 16 did not reference a limitations statute.[33] The Transportation Act of 1920 provided a limitations period of 2 years for actions at law, suits in equity, and proceedings in admiralty arising out of federal controls in WWI (41 Stat. 461). The 1920 Act amended ICA Section 16 to provide a 3-year period to begin an action at law from the time the cause of action accrued, all complaints to the ICC for recovery of damages were to be filed within 2 years subject to possible extension of 90 days, from time of accrual. In respect to a shipment of property the cause of action was deemed to accrue "upon delivery or tender of delivery" by the carrier (41 Stat. 492). In 1924, ICA Section

---

30. Pub.L. No. 85–762, Aug. 26, 1958, 72 Stat. 859, 861.

31. Transportation Payment Act of 1972, Pub.L. No. 92–550, Oct. 25, 1972, 86 Stat. 1163, 1164.

32. Pub.L. No. 93–604, Jan. 2, 1975, 88 Stat. 1959–1961.

33. 24 Stat. at 384.

16(3) was amended to clarify that the time for actions by carriers to recover charges was 3 years; complaints against carriers for damages not based on overcharges were to be filed with the ICC within 2 years; complaints for recovery of overcharges were to be filed within 3 years, subject to 6-month extension from time of disallowance of a claim presented to carrier during the 3-year period (43 Stat. 633). In 1935, motor common carriers became subject to amended ICA § 16 with the same limitations period.[34] Subsequent legislation made further amendments to ICA § 16 relative to judicial actions based on orders of the ICC, and the 2-year—3-year limitations statutes.[35]

Statutes of limitations in the ICA on actions by and against common carriers relative to transportation services provided in 1991–92 are codified at 49 U.S.C. § 11706 (1988).[36] These statutes are:

(a) A common carrier providing transportation or service subject to the jurisdiction of the Interstate Commerce Commission under chapter 105 of this title or a freight forwarder must begin a civil action to recover charges for transportation or service provided by the carrier or freight forwarder within 3 years after the claim accrues.

(b) A person must begin a civil action to recover overcharges under section 11705(b)(1) of this title within 3 years after the claim accrues. If that claim is against a common carrier providing transportation subject to the jurisdiction of the Commission under subchapter I or III of chapter 105 of this title and an election to file a complaint with the Commission is made under section 11705(c)(1), the complaint must be filed within 3 years after the claim accrues.

(c)(1) A person must file a complaint with the Commission to recover damages under section 11705(b)(2) of this title within 2 years after the claim accrues.

(2) A person must begin a civil action to recover damages under section 11705(b)(3) of this title within 2 years after the claim accrues.

(d) The 3-year period under subsection (b) of this section is extended for 6 months from the time written notice is given to the claimant by the carrier of disallowance of any part of the claim specified in the notice if a written claim is given to the carrier within that 3-year period. The 3-year period under subsection (b) of this section and the 2-year period under subjection (c)(1) of this section are each extended for 90 days from the time the carrier begins a civil action under subsection (a) of this section to recover charges related to the same transportation or service, or collects (without beginning a civil action under that subsection) the charge for that transportation or service if that action is begun or collection is made within the appropriate period.

(e) A person must begin a civil action to enforce an order of the Commission against a carrier for the payment of money within one year after the date the order required the money to be paid.

(f) This section applies to transportation for the United States Government. The time limitations under this section are extended, as related to transportation for or on behalf of the United States Government, for 3 years from the date of (1) payment of the rate for the transportation or service involved, (2) subsequent refund for over-payment of that rate, or (3) deduction made under section 3726 of title 31, whichever is later.

(g) A claim related to a shipment of property accrues under this section on delivery or tender of delivery by the carrier.

The limitations relative to the administrative procedures of the ICA are not the only means available for a motor common carrier

---

**34.** *See* Sharpman, *supra* note 17, Vol. IV at 172, n. 64.

**35.** 54 Stat. at 912–13; 72 Stat. at 860–61; 88 Stat. at 1965.

**36.** Pub.L. No. 103–180, § 3, Dec. 3, 1993, 107 Stat.2044, 2049, and Pub.L. No. 103–429, § 6(18), Oct. 31, 1994, 108 Stat. 4377, 4379, substantially amended subsections 11706(a) and (b). Section 11706 as amended in 1993 and 1994 does not apply to plaintiff's 1991–92 spot movements.

to recover alleged undercharges from the United States as a shipper. The carrier may also file a claim under the Tucker Act, 28 U.S.C. § 1491(a) (1994). The time for commencing an action on a spot movement contract, which is not a contract within the purview of the Contract Disputes Act of 1978, is "six years after the right of action first accrues." [37] This statute of limitations applies to causes of action that arise after the periods of administrative limitations.[38] The dissatisfied common carrier may obtain judicial review regardless of whether the claimant has exhausted the administrative remedy of review by the Comptroller General.[39]

## B. Regulations

From 1887, the statutes applicable to common carrier transportation have been supplemented by regulations that flesh out the details of statutory authority. Prior to 1935, common carrier standards did not apply to motor carriers, and, accordingly, such transportation services were obtained directly through independent agency action and applicable agency regulations. After 1935, there was substantial time lag in development of further statutory and agency administrative rules. The Transportation Act of 1940 addressed problems that resulted from conversion of motor transportation to common carrier status and the economic problems generated by the necessity for prompt payment to the new category of transportation contractors.

After 1940, and until consolidation into the new Department of Defense in 1949, services of motor common carriers were obtained directly under regulations produced by each military service. After establishment of DOD, service regulations continued to be operative under the Defense Traffic Management Regulation, and supplemented by regulations of the Defense Logistics Agency. Characteristically, DOD regulations and the regulations of the military services are com-

plex in detail, and there is considerable time lag in development, description, and distribution of changes.

The agency regulations that apply to plaintiff's spot movements in 1991–92 are those of the DOD and its constituent services. Plaintiff provides transportation services to other government agencies, i.e., Treasury, U.S. Printing Office, U.S. Postal Service, Department of Justice, U.S. Mint, Federal Aviation Administration, and NASA. Regulations of the agency involved apply to this other category of plaintiff's transportation services, and those regulations may provide for the contingency that some agencies may base rates on plaintiff's ICC tariffs. The regulations of these other agencies, and rate payments of those agencies based on ICC TSMT tariffs, are not relevant to plaintiff's claims for the 1991–92 spot movements at issue.

The record contains the following DOD regulations that the parties assert apply to the 1991–92 spot movements:

(1) Defense Traffic Management Regulation, July 31, 1986

(2) DOD MT Form 364–R Standard Tender for Freight Services, Instructions for Use, issued October 1, 1986

(3) Military Traffic Management Command Freight Traffic Rules Publication No. 1A (MFTRP No. 1A) issued May 1, 1989, effective June 1, 1989

(4) DOD MT Form 364–R, Standard Tender for Freight Services, Revised Instructions for Use, effective June 1, 1989, and

(5) DOD MT Form 364–R, Standard Tender for Freight Services, Instructions for Use, issued April 1, 1991, effective May 1, 1991

Pursuant to 37 U.S.C. § 3726, GSA has promulgated regulations that supplement the two-tiered review procedure established by the statute.[40] Disputed transportation claims that involve carrier amounts not billed, over-

---

37. 28 U.S.C. § 2401 (1994).

38. *United States v. Western Pac. R. Co.,* 352 U.S. 59, 70–74, 77 S.Ct. 161, 168–71, 1 L.Ed.2d 126 (1956); *United States v. Chesapeake & Ohio Ry. Co.,* 352 U.S. 77, 80 n. 8, 77 S.Ct. 172, 173–74 n. 8, 1 L.Ed.2d 140 (1956).

39. *Dalton v. Sherwood Van Lines,* 50 F.3d 1014, 1017 (Fed.Cir.1995).

40. 41 C.F.R. Part 101–41, Transportation Documentation and Audit.

charges, refunds, or set-offs must be submitted to GSA or the agency out of whose activities the dispute arose, after which an appeal may be taken to the Comptroller General.[41] Applicable statutory limitations on filing claims cognizable by GSA and to review by the Comptroller General are identified.[42] The regulations provide for the set-off of loss and damage claims against monies owed to carriers.[43]

# II

## RCFC Appendix C—Procedure in Common Carrier Cases

### Separate Status

Application of RCFC Appendix C procedures to proof of plaintiff's claims has been a continuing issue. Appendix C requires burdensome detail, extended periods for audit, and its ancient vintage gives it priority over later devised discovery concepts and pretrial procedures. Appendix C is a special discovery procedure for common carrier cases that supersedes other discovery provisions of the court's rules.

Preparation of this case has proceeded on the concept that there should be compliance with Appendix C, at least insofar as applicable to the 13 representative cases. Even for that limited sample, however, the Appendix C structure proved to be inadequate.

Clearly, the court's procedure in common carrier cases needs to be revised. Recent legislation that abolished the ICC and changed the motor carrier regulatory structure requires reexamination of the rules for common carrier cases. The transfer of regulatory authority to the Surface Transportation Board carried with it oversight of national transportation policy, and continued supervision of railroads and other modes of transportation.[44] Transportation services for the United States Government continues to be differentiated, and the statute embodies

the authority that originated in Section 22 and developed into ICA § 10721(b). A carrier may transport property for the United States Government "without charge or at a rate reduced from the applicable commercial rate." [45]

The problems inherent in common carrier cases that generated the procedures in Appendix C, however, remain. Such cases characteristically involve so many separate contractual transactions involving relatively small monetary amounts that adjudication procedures that focus on elements of individual contracts would be administratively unacceptable and precluded by time requirements. The cases are complex in that they involve consideration of freight classifications, tariffs or other rate data, and an administrative two-tiered review procedure. In sum, blanket rules that establish procedures for the varied claims in cases typical to the court's jurisdictional areas, and rules needed to develop the issues that are typical in contract cases under the CDA, are not adequate for adjudication of the claims in common carrier cases.

### Development

The Court of Claims from its creation in 1855 operated under separate rules of practice authorized by its enabling statute. This collection of rules was superseded by the first edition, effective March 15, 1951, of revised rules. One impetus for the 1951 revision was legislation designed to consolidate scattered rule making provisions that previously had applied to specific courts. In July 1947, the court appointed a Rules Committee to prepare new rules of practice predicated on provisions adapted from the Federal Rules of Civil Procedure. The committee's final draft was submitted to the court on October 13, 1950, and was approved by the court on May 1, 1951. The 1951 revision constituted a major departure from prior

---

41. 41 C.F.R. § 101–41.603–4.

42. 41 C.F.R. §§ 101–41.602 and 41.7.

43. 41 C.F.R. § 101–41.504.

44. ICC Termination Act, Pub.L. No. 104–88, Dec. 29, 1995—Subtitle IV of 49 U.S.C., amended, to

include Part A—Rail and Part B—Motor Carriers, Water Carriers, Brokers, and Freight Forwarders.

45. Amended 49 U.S.C. § 13712.

practice.[46] Neither the first or second editions of the revised rules contained a separate section on Procedure in Common Carrier Cases.[47]

The Court of Claims established separate rules of procedure for transportation cases on March 11, 1953, in a Memorandum Order as to Procedure in Common Carrier Cases, effective April 1, 1953. During the period April 1, 1953, through December 4, 1957, judgments in transportation cases that resulted from the procedures incorporated in the March 11, 1953, Memorandum Orders were reported in the court's tables: Judgments Without Opinions.[48]

The procedure for transportation cases that had been established in the March 11, 1953, Memorandum Order, was revised and adopted by court order on July 2, 1957. In a preamble to the revised procedure adopted on July 2, 1957, the Court of Claims explained the reasons and objectives of the revision.

In the preamble, the court noted that practically all suits filed by common carriers for the recovery of transportation charges require a consideration of freight classifications, tariffs, and related data and involve determinations of rates and computations of charges due based on application of such classifications and tariffs. The court also noted that most of the actions have resulted from a determination made by the GAO or other government agency that there was an overpayment of the carrier's charges by the government or from the refusal of the GAO or a government corporation to pay supplemental bills submitted by carriers for claimed undercharges. The preamble also noted that the Department of Justice relies on the GAO and other agencies of the government for the information required in the defense of the suits.

The objective of the revised procedure for transportation cases was to enable the court to expedite final disposition of the common carrier claims. This objective was to be realized by:

(a) disposition of cases or claims, wherever possible, through the filing of requests for the admission of facts and response thereto, or through the medium of pretrial conferences;

(b) limiting the issues to carrier's bills which are actually in dispute; and

(c) ascertaining in advance of trial the amount that either party would be entitled to recover in the event of a decision in its favor.[49]

The revised procedure applicable to common carrier cases first appeared as a separate appendix (Appendix B) in the third edition of the Court of Claims rules of practice, effective December 2, 1957.[50] A separate Appendix B was in Rules—4th Ed. It became Appendix C in Rules—5th Ed. For conve-

---

46. *See* 140 Ct.Cl.—Rules—Forward iii. The Court of Claims subsequently identified publication of revisions to the rules as first edition (1st Ed.)—May 15, 1951; second edition (2d Ed.)—Oct. 15, 1953; third edition (3d Ed.)—Dec. 2, 1957; fourth edition (4th Ed.)—Apr. 1, 1964; and fifth edition (5th Ed.)—Sept. 1, 1969.

47. 1st Ed., 118 Ct.Cl. following xxi; 2d Ed., 126 Ct.Cl. xxviii et seq.

48. U.S. Court of Claims Reports:

| Vol. | Pg. | Year |
|---|---|---|
| 125 | 867 | (1953) |
| 126 | 943 | (1953) |
| 127 | 825 | (1954) |
| 128 | 767 | (1954) |
| 129 | 801 | (1954) |
| 130 | 805 | (1955) |
| 131 | 801 | (1955) |
| 132 | 799 | (1955) |
| 133 | 799 | (1955) |
| 134 | 887 | (1956) |
| 135 | 979 | (1956) |
| 136 | 801 | (1956) |
| 137 | 917 | (1956–57) |
| 138 | 869 | (1957) |
| 139 | 829 | (1957) |
| 140 | 569 | (1957) |

49. 140 Ct.Cl.—Rules, 3d Ed., App. B, n. 1, p. 161 (1957). Vol. 140 of the Court of Claims reports contains the Dec. 2, 1957, revision (3d Ed.) at XVIII, et seq. The 3d Ed. Is separately paginated, with front material designated in roman and Rules through Appendix B designated in arabic, serially 1–172. Appendix B is at Rules, pages 161–72.

50. 140 Ct.Cl.—Rules, p. 161 (1957); *See* Stern & Brenner, THE 1957 REVISION OF THE RULES OF THE UNITED STATES COURT OF CLAIMS, 21 FRD 259, 274–79 (1958), for discussion of the amendments to the Mar. 11, 1953, Memorandum Order.

nience, the separate appendix will be cited as Appendix C, as of the relevant year.

The procedure in common carrier transportation cases that was incorporated in the December 2, 1957, revision (Rules, 3d Ed.) of the Court of Claims rules was carried forward, verbatim in many provisions, in Rules, 4th Ed., and in Rules, 5th Ed.[51]

The format of the Table of Contents in Appendix C—1957, 1964 and 1969 is identical: Part I. Carrier's Request for Admission of Facts: Sec. 1, Sec. 2, subsections (A)-(J), Sec. 3; Part II. Defendant's Response: sections 4–12; Part III. Application to Special Cases; Commissioner's Orders: sections 13, 14; Part IV. Commissioner's Responsibility: sections 15, 16; Part V. Acceptance of Response; Pretrial; Judgment: sections 17–19; and Part VI. Cases Within the Primary Jurisdiction of Interstate Commerce Commission: sections 20–25. Virtually all of the provisions are reissued verbatim [52]

Differences in Appendix C—1969 from Appendix C—1957 are few and minor: Paragraph (i) in the 1957 version was deleted and former paragraphs (j) through (r) were redesignated (i) through (q). The words "-less land grant deduction, if any-" in former Paragraph (q) were deleted. In former Section 24 references to provisions of the rules were omitted, and the last sentence was rephrased to defer trial of case until final action by the commissioner or by the court. New section 12 changed internal references to accord with provisions of the new rules, and added a proviso that referenced the statute of limitations in 49 U.S.C. § 16(3)(d) (now at 49 U.S.C. § 11706) and stated that the period of limitations on filing a defendant counterclaim is not extended by any rule or order pursuant to Appendix C.

In 1982, the United States Claims Court was created by the Federal Courts Improvement Act of 1982.[53] The Claims Court Rules, effective October 1, 1982, as revised to March 15, 1992, includes an Appendix C that substantially is the same as Appendix C in the Court of Claims Rules, 5th Ed., as amended to March 31, 1974.[54] In Appendix C—1982, as amended, the provisions that applied to commissioners or trial judges of the Court of Claims (App. C—1969, Parts III and IV, Sections 13–16) were deleted; the provisions of former Part V, Sections 17–19, were incorporated in new Part III, Sections 13–15, less provisions applicable to commissioner/trial judges; and the provisions applicable to cases within the primary jurisdiction of the ICC (former Part VI, Sections 20–25) were incorporated in new Part IV, Sections 16–21.

Most of the provisions in Appendix C—1982, as amended, were transferred verbatim from Appendix C—1969, as amended. Part II, Section 11, in recognition of the 1975 transfer of auditing functions to the GSA, changed "General Accounting Office" to "General Services Administration."

### Status 1994

Appendix C—1982, when plaintiff filed its complaint on May 26, 1994, to recover freight transportation charges as a motor common carrier, embodied special procedures that had originated and had been implemented to resolve problems in cases where business transactions were subject to regulation by a

---

**51.** 165 Ct.Cl. xx (1964); 189 Ct.Cl. 590 et seq. (1969).

**52.** In all versions of Appendix C, the method used to identify/ubdivision provisions is complex. The nomenclature sequence is Parts, Sections, Subsections, Items and Paragraphs. All subdivisions, except Paragraphs, have captions. Parts are in roman capitals I through VI; Sections are designated in arabic numbers 1 through 25 in an unbroken sequence through all Parts; in Section 2, subsections are designated by capital letters in parentheses (A)—(J); in Subsection (G), Items are designated by arabic numbers in parentheses (1) through (3); in Item (2), Paragraphs are designated by small letters in parentheses (a) through (r).

**53.** Pub.L. No. 97–164, Apr. 2, 1982, 96 Stat. 25, 27; Section 139(b)(1) of the Act amends 28 U.S.C. § 2503(b) and authorizes the Claims Court to prescribe rules of practice and procedure.

**54.** The 1969 Court of Claims Rules and the 1982 Claims Court Rules are in a loose-leaf format. This format permits incorporation of future modifications by insertion of new pages. The changes to Appendix C during the period Sept. 1, 1969, through Mar. 31, 1971, and the changes during the period Oct. 1, 1982, through Mar. 15, 1992, did not substantially alter substantive provisions.

government agency, or where the case involved agency procedures to resolve contract disputes. Appendix C embodied concepts that some issues were within the primary jurisdiction of the ICC, and such issues were required to be determined prior to judicial action,[55] and concepts that defined limits on judicial procedures reviewing agency contract decisions under Wunderlich Act standards.[56]

Part IV of Appendix C—1982 is devoted to the special procedures required by the primary jurisdiction doctrine. The Court of Claims, in its discussion of Appendix C procedures relative to the primary jurisdiction of the ICC, noted the similarity to procedures in the new rules for Wunderlich Act reviews, adopted May 23, 1967.[57] Both procedures provided a means to challenge an agency decision, a response by the adverse party, isolation of contested facts, disposition by summary judgment of issues of law, and a trial on issues not resolved. Any trial would be pursuant to standard procedures in other provisions of the rules.

Appendix C—1982 provides a special procedure designed to accomplish a judicial disposition by summary judgment procedures, or, if summary judgment is precluded, by a trial. The Appendix C procedure is a substitute for requests for admission, RCFC 36 and App. G—¶ 7, and for summary judgment, RCFC 56 and 56.1. The procedure applies to every suit filed by a common carrier for the recovery of freight transportation charges.

In addition to Part IV, Appendix C contains three parts:

Part I   Carrier's Request for Admission of Facts

Part II   Defendant' Response

Part III   Acceptance of Response; Pretrial; Judgment.

Part 1 contains three sections; section 2 contains eight subsections (A–H) that apply to claims for the transportation of property; subsection (G) contains three items; item (2) contains 17 paragraphs. Nomenclature of the various divisions is not complete; in format, the divisions are identified by roman capitals, arabic numbers, capital letters in parenthesis, arabic numbers in parenthesis, and small letters in parenthesis. Part I, 2(E), for example, refers to (G) and (I) as paragraphs but does not name the subparts of (G) and (I). For convenience, and to remedy the confusion that is apparent in the motion papers and orders of the special procedure, in this opinion the subdivisions in descending order have been given the following names: Parts, Sections, Subsections, Items, and Paragraphs. A graphic representation of the divisions in Section 2 would appear:

Part I
  Sec. 2.   Form & Content of Request
    Subsec. (G)   Schedule, Claim for Transportation of Property

---

**55.** The rationale for the doctrine of primary jurisdiction was stated by the Supreme Court in *Far East Conference v. United States,* 342 U.S. 570, 72 S.Ct. 492, 96 L.Ed. 576 (1952); it had its origin in *Texas & Pacific Ry. v. Abilene Cotton Oil Co.,* 204 U.S. 426, 27 S.Ct. 350, 51 L.Ed. 553 (1907); subsequent cases defined application of the concept, *see, Seatrain, Inc. v. Pennsylvania R.R. Co.,* 207 F.2d 255 (3d Cir.1952); *Baltimore & Ohio R.R. v. United States,* 141 Ct.Cl. 128, 158 F.Supp. 862 (1958); *McLean Trucking Co. v. United States,* 181 Ct.Cl. 170, 387 F.2d 657 (1967).

**56.** The Wunderlich Act, May 11, 1954, 68 Stat. 81, 41 U.S.C. §§ 321, 322 (1994) established standards for review of agency decisions on the scope of a finality clause in the disputes article of a Government contract in an effort to clarify the Supreme Court decision in *United States v. Wunderlich,* 342 U.S. 98, 72 S.Ct. 154, 96 L.Ed. 113 (1951). That decision held judicial review of questions of fact was foreclosed, except to determine whether or not the agency decision had been founded on intentional fraud. The Act provided that an agency decision in contract disputes would be final and conclusive, unless fraudulent, capricious, arbitrary, so grossly erroneous necessarily to imply bad faith, or not supported by substantial evidence, and that no contract could contain a provision that made any administrative decision final on a question of law. Subsequent Supreme Court decisions further refined the standards: *United States v. Carlo Bianchi & Co.,* 373 U.S. 709, 83 S.Ct. 1409, 10 L.Ed.2d 652 (1963); *United States v. Utah Constr. & Mining Co.,* 384 U.S. 394, 86 S.Ct. 1545, 16 L.Ed.2d 642 (1966); *United States v. Anthony Grace & Sons, Inc.,* 384 U.S. 424, 86 S.Ct. 1539, 16 L.Ed.2d 662 (1966); and *S & E Contractors, Inc. v. United States,* 406 U.S. 1, 92 S.Ct. 1411, 31 L.Ed.2d 658 (1972).

**57.** 178 Ct.Cl. xxii et seq., Rules 94–100; *McLean Trucking Co.,* 387 F.2d at 660, n. 1.

Item (2) Detail for Each Bill of Lading Paragraphs (a) to (q)

The paragraphs applicable to each bill of lading require precise details, such as:

(d) a description of the commodity or commodities shipped, including a description of the packing where this affects the rate;

\* \* \* \* \* \*

(f) the weight of the shipment, including the minimum carload weight when greater than the actual weight;

\* \* \* \* \* \*

(i) the total freight charges on each bill of lading;

\* \* \* \* \* \*

(*l* ) the total amount paid the carrier;

(m) the balance due;

(n) a specific reference to the item or items in designated tariffs authorizing the charges claimed, including the classification rating if necessary, and authorization for any accessorial charges claimed; or to a § 22 quotation;

(o) the Government file reference number as obtained from GSA notice of overcharge, the Certificate of Indebtedness, or other document issued by the GSA, or, in the event there is no GSA reference number, the name of the Government paying agency and bureau, the disbursing office voucher number, and the date of payment;

\* \* \* \* \* \*

(q) a brief statement as to the basis for the claim or other brief statement which the carrier deems necessary to explain the peculiarities of the shipment.

Item (3) (of Part I, Section 2, subsection G), Computation for Typical Bill of Lading, reads as follows:

(3) Following the listing of information herein required with respect to each group of carrier's bills involving the same issue or basis of freight charge computation, the carrier shall either (i) include in the schedule a computation of the freight charges for that bill of lading, setting forth the basis or formula used, and referring to the specific items in particular tariffs or other authority which it relied upon for that purpose, or (ii) attach a worksheet showing such computation and information with respect to each typical bill of lading.

In Part II, defendant must respond to the information presented in the Items and Paragraphs of Part I. Sections 8 and 9 impose the following requirements on defendant:

8. **Verification of Carrier's Computations.** If the defendant finds that the schedule attached to plaintiff's request, or any portion affecting the amount claimed, is incorrect on the basis of the tariffs, § 22 quotations, or other authority relied on by plaintiff in its request, there shall be attached to the response a schedule prepared by the defendant, setting forth the facts and figures as to the amount of freight charges which defendant asserts would be due on each carrier's bill if the court holds that the tariffs or other authorities relied on by plaintiff in its request are applicable, and showing how the defendant arrived at any changes or corrections in the amounts claimed by plaintiff.

9. **Schedule: Defendant's Basis for Applicable Charges.** If the Defendant claims that the tariffs, § 22 quotations, or other authority relied on by plaintiff are inapplicable with respect to any of the carrier's bills listed in plaintiff's request, there shall be attached to the response a schedule prepared by the defendant, setting forth the facts and figures in detail as to the amount of freight or passenger charges defendant claims is due on each disputed carrier's bill and containing a specific reference to the item or items in designated tariffs, § 22 quotations, or other authority relied on by defendant in support of its contention. The schedule shall also comply with the terms of ¶ 2(G)(3).

In Part III, Section 14, if plaintiff has not filed an acceptance of the amount shown to be due in defendant's response, a pretrial conference is required to be held for the purpose of:

... (1) resolving all issues and recording an agreement for the entry of judgment or for a dismissal of the complaint or any part thereof, or

(2) segregating the carrier's bills in dispute from those not in controversy and fixing the amount that either party would be entitled to recover in the event of a decision in its favor, and/or

(3) taking any other action that may aid in the prompt disposition of the suit.

## III.

*Special Procedure*

*Overview*

During the period May 26, 1994, to August 25, 1997, a special procedure applied to claims plaintiff had filed in three dockets: No. 94-347C, No. 94-450C and No. 95-705C. Initially, there was an attempt to bypass Appendix C, isolate the controlling legal issue, and resolve it pursuant to RCFC 56 summary judgment procedures. The parties in their supporting papers on the cross-motions for summary judgment, however, did not resolve material issues of fact, failed to stipulate all relevant facts, failed to identify contract documents basic to plaintiff's claims, and failed to analyze applicable statutes, regulations and agency written procedures and practices. On November 22, 1995, an order was entered that disposition by summary judgment procedures at that time was precluded and each party was directed to file recommendations for further proceedings.

On February 9, 1996, after the parties had filed a joint statement of recommendations, the special procedure went forward on the basis of analysis under Appendix C procedures of 13 representative claims in docket No. 94-347C. A decision on the representative claims applies to all claims in docket No. 94-347C, Counts I-III in docket No. 94-450C, and Count II in docket No. 95-705C.

*Development to Feb. 9, 1996*

The complaint in docket No. 94-347, filed May 26, 1994, invoked jurisdiction pursuant to 28 U.S.C. § 1491 and sought to recover additional compensation under contracts for the transportation of property by motor common carrier with agencies of DOD. The complaint contained two counts: Count I alleged that, beginning September 1, 1989, plaintiff transported shipments of property which were in the foreign commerce of the United States, that defendant had paid for the transportation on the basis of interstate tenders submitted by plaintiff to the government, that payment should have been based on tariffs filed with the ICC, and sought an additional $212,033.31 for those shipments; Count II alleged that on some of the shipments, defendant had paid on the basis of intrastate tenders submitted by plaintiff under statutes of a state or states of the United States, and sought an additional $638.40 for those shipments.

The May 26, 1994, complaint did not present the issues that are typical in contract cases. It was not sufficiently detailed to satisfy the requirements for pleading special matters in contract cases. RCFC 9(h)(3). Specific contracts were not identified, relevant documents were not attached or identified by reference, and applicable agency regulations were not referenced. The case obviously was filed by a common carrier for the recovery freight transportation charges and was subject to Appendix C.

The First Amended Complaint, filed June 20, 1994, amended Count I to seek an additional $361,215.10; amended Count II to seek an additional $27,809.41; and added a new Count III, that alleged some of the shipments had been in interstate commerce, that defendant had paid on the basis of intrastate tenders rather than interstate tenders, and sought an additional $368.80 for those shipments. The total amount claimed in the First Amended Complaint for transportation services was $389,393.31.

The First Amended Complaint continued the same pleading infirmities that were present in the May 26, 1994, complaint. The question of whether the parties recognized that Appendix C applied to the claims in the First Amended Complaint was resolved on June 20, 1994, with the filing of plaintiff's Request for Admission of Facts (RAF), as required by Appendix C, Part I, Sec. 1.

The June 20, 1994, RAF designated the contract claims in categories A, B, and C, based on counts I, II and III of the first amended complaint. A-claims involve contracts in which the payment was based on interstate tenders (rather than ICC tariffs); B-claims involve contracts in which the payment was based on intrastate tenders (rather than ICC tariffs); and C-claims involve contracts in which the payment was based on intrastate tenders (rather than interstate tenders). Docket No. 94–347C contains claims on 264 contracts: A–1 through A–252 ($361,215.10); B–1 through B–11 ($27,809.41) and C–1 ($368.80). Total claim: $389,393.31.

The complaint in docket No. 94–450C, filed July 12, 1994, was in the same format, with allegations in the same language, and with the same Counts I, II and III. The complaint sought an additional $338,983.59 in Count I, an additional $818.40 in Count II, and an additional $256.80 in Count III. The total amount claimed for transportation services in the July 12, 1994, complaint was $340,058.79.

The RAF in docket No. 94–450C, filed August 9, 1994, continued the designation of contract claims in categories A, B, and C. The August 9, 1994, RAF contained claims on 150 contracts: A–253 through A–398, B–12 through B–14, and C–2.

On July 22, 1994, plaintiff moved for a status hearing to resolve procedural issues in docket Nos. 94–347C and 94–450C. Plaintiff's motion stated that docket No. 94–347C concerned shipments from May 8 to June 26, 1991, and that docket No. 94–450C concerned shipments that occurred from July 2 to August 9, 1991. Plaintiff asserted that the 3-year statute of limitations in 49 U.S.C. § 11706 applied to the filing of claims based on transportation contracts and that the limitations period would expire on or about the last week of August with respect to shipments which occurred after August 9, 1991. Plaintiff stated it sought to avoid the filing of numerous complaints and would request leave to supplement its complaints to set forth claims to be uncovered in the future.

Defendant, on July 27, 1994, moved to stay proceedings in docket No. 94–450C. Defendant asserted an audit under Appendix C would be premature and wasteful of scarce resources until it was determined as a matter of law which rates the auditors should apply to plaintiff's shipments.

A status conference was held on August 11, 1994, to discuss the parties' motions and future proceedings in these dockets.[58] After the conference an order was entered that noted that the legal issue in these common carrier cases in both dockets was the same: what rates apply to plaintiff's shipments; that the respective dockets cover shipments in different time periods, and that plaintiff anticipates additional claims in other time periods.

The order established a procedure for disposition of the legal issue prior to disposition under RCFC Appendix C. In docket No. 94–347C, defendant was authorized to file a partial response to the June 20, 1994, RAF that "provides information sufficient to proceed to an early resolution of the legal issue." Proceedings in No. 94–450C, were "stayed until further order." During the period of the stay, plaintiff was authorized to file motions to amend complaint counts I, II, and III, "so as to include claims that apply to shipments in additional time periods." Such amendments were to change the monetary amounts claimed in each count, to include the list of carrier's Bills in Dispute required by RCFC Appendix C, Part I, Sec. 2, (G), (1), and with respect to such amendments, plaintiff was not required to comply with the other provisions of RCFC Appendix C, Part I, Sec. 2. Defendant's answer to the July 12, 1994, complaint, its response to the August 9, 1994, RAF, as well as answers and affirmative defenses to each amended complaint were deferred during pendency of the stay. Amendments to the complaint in No. 94–450C were effective as of the date of the original complaint.

Subsequently, the special procedure was modified to permit amendments in No. 94–450C that included a Count IV: which al-

---

58. Attorney of record for defendant in docket No. 94–450C did not participate in the status conference. That docket subsequently was transferred and after Aug. 30, 1994, the same attorney of record for defendant appeared in both dockets.

leged that on some shipments the United States had been reimbursed by foreign governments for freight transportation charges, that the United States had paid plaintiff on the basis of tenders, and that only ICC tariffs were applicable. Plaintiff was not permitted to add Count IV to No. 94–347C for the reason that it added a new issue that was beyond the scope of the special procedure.

Pursuant to the special procedure, there were 15 amendments to No. 94–450C during the period September 9, 1994, to February 2, 1996. As amended, this docket contains contract Claims A–253 through A–4059, that total $6,032,954.99; B–12 through B–126, that total $105,5665.53; and C–2 through C–14, that total $7,177.96. The total amount claimed in No. 94–450C is $6,145,798.48.

The complaint in docket No. 95–705C, filed October 26, 1995, alleges in Count I, plaintiff transported property of the United States Coast Guard, an agency of the Department of Transportation, and plaintiff was paid on the basis of a tender that had been offered to DOD. In Count I, plaintiff asserts an ICC tariff applies and seeks an additional payment of $4,287. In Count II, plaintiff alleges alternatively that the shipment of property was in foreign commerce, that the payment to plaintiff was based on an interstate tender, and that the only applicable rate was in an ICC tariff. In Count II, plaintiff seeks an additional payment of $4,287.

Plaintiff filed an RAF on October 26, 1995, in No. 95–705C, as to Count I only. On December 21, 1995, on motion from plaintiff proceedings with respect to Count II were stayed pending resolution of the legal issues in No. 94–347C. On October 16, 1996, Count I was dismissed by stipulation of the parties.

The special procedure to bypass disposition under RCFC Appendix C was altered by order on February 9, 1996. The increase in the number of contracts, added by amend-

ments to No 94–450C, involved in the special procedure was excessive. The parties' contentions as to applicability of a 3-year statute of limitations in 49 U.S.C. § 11706 had not been adequately briefed, and there was confusion as to the effect of the limitations period provided by 49 U.S.C. § 16(3)(d) cited in Appendix C—Part II, Sec. 12. As a result, it was ordered that no further amendments to the complaint in No. 94–450C would be permitted. The status of docket No. 94–450C has been maintained in status quo since that date. Further special proceedings on Counts I, II, and III in No. 94–347C continued on the basis of an examination of 13 representative claims under an Appendix C analysis. Proceedings on Count II of No. 95–705C, remained stayed pending disposition of legal issues in No. 94–347C.

Subsequent to the February 9, 1996, order to maintain docket No. 94–450C in its then current status, with no amendments to the complaint after the 15th, Tri–State by September 23, 1997, had filed 13 cases.[59] These cases were for the recovery of transportation charges and were subject to RCFC Appendix C procedures. The additional cases contain contract claims A–4060 through A–5281, B–127 through B–213, and C–15 through C–25. The additional amount claimed on A-claims is $2,841,584.46, on B-claims is $60,807.50 and on the C-claims is $5,659.74, a total of $2,908.051.70.[60]

During the period February 9, 1996, through September 29, 1997, TRISM Eastern, Inc., d/b/a/ C.I. Whitten Transfer Company, a predecessor corporation of TRISM Eastern, filed 13 cases which, pursuant to RCFC 77(f)(2) were noticed as related cases.[61] As related cases, they called for determination of the same or substantially identical questions of law as are at issue in Count 1 of the complaint in this proceeding, namely whether defendant wrongfully paid

---

**59.** Docket Nos. 96–203C, 96–272C, 96–362C, 96–609C, 96–661C, 96–745C, 97-–24C, 97–126C, 97–191C, 97–483C, 97–506C, 97–615C, 97–636C.

**60.** Docket No. 97–24C concerned four 1991 transportation contracts with DOD, on GBLs prepared in April 1991, and payments on billings submitted in 1991–92. The claim is for detention charges, allegedly assessed improperly under

Tri–State's tender, in the amount of $74,299.81. This amount is not included in the total for A-, B- and C-claims.

**61.** Docket Nos. 96–124C, 96–192C, 96–268C, 96–343C, 96–410C, 96–535C, 96–566C, 96–685C, 97–342C, 97–451C, 97–495C, 97–537C and 97–653C.

rates applicable only to interstate shipments for shipments of property transported by plaintiff which were exported or imported. The TRISM dockets designate the contract claims as A–claims, which are comparable to A–claims in the Tri–State dockets: i.e., payments based on interstate tenders rather than ICC tariffs. TRISM cases contain claims A–1 through A–274, and seek a total additional payment for those claims of $264,168.66.

*Docket No. 94–347C: June 20, 1994—Aug. 25, 1997*

In No. 94–347C, plaintiff's RAF was filed on June 20, 1994, and defendant was ordered, pursuant to Appendix C—Part II, Sections 4–12, to file its response to the RAF and its Answer on or before 90 days from June 21, 1994. After the special procedure to bypass Appendix C was established in the August 11, 1994, order, defendant filed on September 19, 1994, a partial answer and a partial response to the RAF. Defendant's partial answer and partial response to the RAF was limited to information that could be obtained without the benefit of an audit of plaintiff's claims on the 264 contracts listed in the RAF.

During a status conference on December 7, 1994, it was noted that the posture of the case did not accord with proceedings outlined in Appendix C, Part I, Sec. 3, and Part II, Sec. 4, and that Part III, Sections 13 and 14 were not appropriate in the absence of an audit. It was agreed that further proceedings would be based on a joint stipulation of facts and cross-motions under RCFC 56 for summary judgment. Defendant's partial answer and response were superseded by the revised schedule.

The parties on December 30, 1994, filed a document captioned: Joint Stipulation of Authenticity; plaintiff filed on January 25, 1995, a motion for partial summary judgment; and further briefing and relevant papers pursuant to RCFC 56, 82, 83, 83.1 and 83.2 were completed on May 26, 1995.

During the period March 31, 1995, to October 26, 1995, other matters in No. 94–347C required attention by the parties and the court. These other matters included: a motion by defendant to dismiss under RCFC 12(b)(4), contentions and briefs concerning applicable statutes of limitations, and plaintiff's motion for an order requiring preservation of evidence. Oral argument on the cross-motions for summary judgment was heard on November 21, 1995.

At oral argument, claims A–25, A–204, B–2, B–4 and C–1 were identified as examples that illustrated defects in the papers filed in support of the respective motions for summary judgment. The specific defects were:

- the joint stipulation did not include facts necessary for decision; the only fact that was stipulated was the authenticity of certain documents;
- the motion papers were confusing as to the meaning of terms such as "tender," "Government Bill of Lading," and common carrier "contract";
- documents alleged to constitute a contract for a spot movement were not identified or stipulated;
- there was no discussion or analysis of applicable DOD procedures;

there was no analysis of circumstances in which ICC motor carrier regulations apply to Section 22 procedures and exemptions;

- The papers did not clarify regulations that apply to "tenders" submitted to DOD;
- TSMT tenders to DOD in the record were incomplete, most consisted of only the first page.

The oral argument on November 21, 1995, confirmed that material in the record would not support summary disposition under RCFC 56. Each of the cross-motions was denied. The November 22, 1995, order directed each party to file a statement of recommendations for further proceedings. The joint statement of recommendations, filed January 23, 1996, was discussed at a status conference on February 8, 1996, which concluded that the claims in docket No. 94–347C would proceed under Appendix C procedures, applied to a representative sample of 13 claims.

The procedure as established in orders dated February 9 and July 19, 1996, was:

- the parties would select as representative claims—ten "A" claims from Count I of the

amended complaint, two "B" claims from Count II, and one "C" claim from Count III;

● plaintiff would file a new RAF under Appendix C—Part I, Sec. 2;

● defendant would audit the representative claims and file a response to the new RAF under Appendix C—Part II, Sections 6–10;

● after defendant's response to the RAF, the parties would file any stipulation as to the amounts due to plaintiff under the audit, and as to any additional facts highlighted in the November 22, 1995, order. Each party also would file briefs that responded in detail to item 3 (failure to establish elements of contract formation and failure to identify contract documents on which plaintiff's claims are based) and item 4 (failure to present analyses of applicable statutes, regulations and agency written procedures and practices) of the November 22, 1995, order, as well as final proposed findings of fact, and final statements of genuine issues;

● further proceedings would be determined at a pretrial conference under Appendix—Part III, Sec. 14.

The selected representative claims were: A–5, A–6, A–50, A–81, A–135, A–176, A–191, A–204, A–237, A–243, B–3, B–10, and C–1. The claims in A–204 and C–1, had been identified at the November 21, 1995, oral argument as examples to illustrate defects in the motion papers filed in support of the respective motions for summary judgment under RCFC 56. Appendix B to this opinion sets forth the relevant facts of the spot movements in the representative claims.

On May 14, 1996, after defendant had completed audit of the representative claims and filed its response to the second RAF, plaintiff filed a motion to determine sufficiency of defendant's responses. Plaintiff's motion applied to requests for admission of defendant's intent regarding the ultimate origin and destination of shipments in the representative claims, and to defendant's responsibility for transportation in a foreign country, before or after plaintiff transported the shipments in the representative claims. After examination of the motion papers, plaintiff's motion was denied on July 19, 1996. The order, which was based on assertions in the motion papers and the provisions of Appendix C—Part II, Sections 10 and 11, included:

2. The truth of matters of fact relied upon by plaintiff for recovery on the representative claims in the Second Request for Admission of Facts, and as to which defendant denied with the assertion such matters of fact were not material, is deemed to be admitted.

GSA's audit of the representative claims shows that on each shipment, defendant paid the amount that had been billed by plaintiff for the applicable GBL, and the parties' computations of amounts due on tariffs or other authorities relied upon by plaintiff. GSA's computations accord with plaintiff's in four cases, A–81, A–191, A–204 and C–1 (after correction of arithmetical error). This information is shown on the following table:

TABLE I

| Col. 1 | Col. 2 | Col. 3 | Col. 4 | Col. 5 | Col. 6 |
|---|---|---|---|---|---|
| A–5 | $ 2,899.17 | $ 5,197.55 | $ 2,318.38 | $ 4,716.17 | $ 1,837.00 |
| A–6 | $ 2,879.17 | $ 5,197.55 | $ 2,318.38 | $ 4,716.17 | $ 1,837.00 |
| A–50 | $15,000.00 | $27,846.00 | $12,846.00 | $27,142.05 | $12,142.05 |
| A–81 | $ 1,130.91 | $ 1,195.63 | $ 64.72 | $ 1,195.63 | $ 64.72 |
| A–135 | $ 2,879.47 | $ 4,788.70 | $ 1,859.53 | $ 4,313.10 | $ 1,433.93 |
| A–176 | $15,723.80 | $25,852.04 | $16,591.25 | $24,121.12 | $ 8,397.32 |
| A–191 | $ 700.00 | $ 775.00 | $ 75.00 | $ 775.0 | $ 75.00 |
| A–204 | $ 903.15 | $ 1,050.33 | $ 147.18 | $ 1,050.33 | $ 147.18 |
| A–237 | $ 3,441.60 | $ 6,810.30 | $ 3,368.70 | $ 4,187.28 | $ 745.68 |
| A–243 | $ 470.00 | $ 1,430.66 | $ 960.66 | $ 757.27 | $ 287.27 |
| B–3 | $ 475.00 | $ 1,349.60 | $ 874.60 | $ 458.50 | $ 16.50 * |
| B–10 | $10,092.80 | $16,593.70 | $ 6,500.90 | $15,615.60 | $ 5,522.52 |
| C–1 | $ 650.00 | $ 1,006.80 | $ 368.80 | $ 1,006.80 | $ 358.80 * |

| Col. 1 Notes | Col. 2 | Col. 3 | Col. 4 | Col. 5 | Col. 6 |
|---|---|---|---|---|---|

Col. 2 Amount billed on applicable GBL and paid
Col. 3 Calculation of Total Freight Charges—Plaintiff
Col. 4 Amount Due Plaintiff—Plaintiff computation
Col. 5 Calculation of Total Freight Charges—GSA
Col. 6 Amount Due Plaintiff—GSA computation; *B–3 was over billed, amount is due United States; *C–1 contains an arithmetical error, the amount should be $368.80

Plaintiff did not accept the computations in defendant's response. Appendix C—Part III, Sec. 13. Accordingly, a pretrial conference, pursuant to Appendix C—Part III, Sec. 14 was held on April 11, 1997. At that conference, the parties were told the materials in the record did not resolve issues of material fact and isolate the questions of law to be decided. It was noted that proceedings under Appendix C had been completed as to the representative claims, and that it was clear that as the record now stands, material facts either are in dispute or are not addressed. Disposition of plaintiff's representative claims by summary judgment at the pretrial conference was not appropriate.

Further proceedings for decision on the representative claims could be either by trial after completion of RCFC Appendix G procedures, or, through completion of the record with information that would show each party's positions as to the facts material to a summary judgment motion and would isolate the legal issues to be resolved.

Summary disposition of the representative claims requires the parties to identify, by citation to specific paragraphs or section numbers, the regulatory provision that applies to each contract claim. It is not sufficient to make a blanket, generalized reference to the regulation by its name or chapter heading.

One defect that pervades the supporting papers has been the failure of the parties to distinguish between the case precedent and regulatory concepts that apply to plaintiff's commercial business, and case precedent and regulatory concepts that apply to spot movement contracts with the Department of Defense. In general, the papers reflected a failure to cite specific regulations and agency procedures that apply to the shipments in each of the representative claims.

Of the 13 representative claims, eight were billed to the DOD under a tender that was different from the tender listed on the GBL. The following table was considered and discussed at the pretrial conference.

TABLE II

| Claim | GBL Tender | Freight Bill Tender |
|---|---|---|
| A–81 | 401 | 404 |
| A–135 | 417 | 450 |
| A–176 | 552 | 416 |
| A–191 | 401 | 452 |
| A–237 | 340 | 432 |
| B–3 | 260 | 340 |
| B–10 | 319 | 421 |
| C–1 | 260 | 421 |

Errors may be found and corrected in the carrier's billing procedures. Correction of a tender number does not establish that ICC tariffs apply. In the supplemental briefing, each party was directed to show how the GBL tender is erroneous and how the freight bill tender is correct. The particular provisions applicable to each tender should be cited by page and item number.

It was agreed at the pretrial conference that an effort would be made to complete the record so as to permit disposition by summary judgment. A schedule for filing additional documentation needed to delineate all facts material to the representative claims was established. Documentation and briefing was completed August 25, 1997.

### DISCUSSION

Proceedings after the April 11, 1997, pretrial conference aimed at completion of a record that would isolate the legal issues to be resolved in the 13 representative claims. This required the parties to file additional information that would establish undisputed facts material to each party's position on the issue of whether plaintiff's ICC tariffs applied to the spot shipments in the representative claims. The record now contains the available relevant documentary evidence and

DOD directives, regulations and instructions that bear upon the shipments. The record also contains statements and declarations of individuals responsible for plaintiff's technical and financial operations, and declarations of officials responsible for operations of DOD freight transportation programs and GSA's audits of freight transportation bills. Each party asserts there is no genuine issue as to any material fact applicable to any claim in docket No. 94–347C. The purpose of summary judgment is to assess the specific facts to see if there is a genuine need for trial. Trial would not produce additional factual information that would be outcome determinative under governing law. Disposition of the ultimate legal issues on the basis of the present record is appropriate.

One problem that has complicated these proceedings has been differences in the meaning of the word "tender." "Tender" sometimes is employed to refer to the act of a shipper to make the property to be transported available to a carrier,[62] or to the act of the carrier on delivery of the property.[63] Sometimes the word is employed to refer to publications by a carrier that establish a specific rate or route for a particular transportation service.[64] These differences were reflected in the joint stipulations, requested findings of fact, and briefs. In this opinion, the word "tender" refers to a specific document, named Standard Tender of Freight Services, issued by a carrier, in a format established by DOD, to offer transportation services and prices to DOD. The DOD standard tender is designed for complete automation of all data.[65]

Another problem involved the sequence of contract formation and identification of docu-

ments that establish contract terms. A contract could come into existence, variously, when the Government as shipper tendered property to the motor carrier, or when a GBL was issued, or when the carrier tendered the property to Government as consignee. A transportation contract could consist of a GBL,[66] a combination of a DOD tender and a GBL,[67] or a combination of an ICC tariff and a GBL.[68] In this opinion, the transportation contracts are defined in (1) DOD regulations, (2) TSMT tenders, and (3) GBLs applicable to the representative claims. The regulations are DOD DTMR, MTMC Freight Traffic Rules Publication No. IA (MFTRP No. 1A), and DOD MT Form 364–R, Standard Tender of Freight Services, effective June 1, 1989, or DOD MT Form 364–R, effective May 1, 1991. The TSMT tenders and GBLs are shown on Table III.

TABLE III

| Representative Claim | TSMT Tender | GBL |
|---|---|---|
| A–5 | 0417 | D–1,121,162 |
| A–6 | 0417 | D–1,121,159 |
| A–50 | 0395 | C–8,760,777 |
| A–81 | 0404 | E–0,723,698 |
| A–135 | 0450 | D–1,121,247 |
| A–176 | 0416 | D–1,261,420 |
| A–191 | 0452 | D–1,690,230 |
| A–204 | 0396 | E–1,078,693 |
| A–237 | 0432 | E–1,029,809 |
| A–243 | 0475 | C–9,457,068 |
| B–3 | 0340 | E–1,132,177 |
| B–10 | 0421 | C–8,760,987 |
| C–1 | 0421 | C–9,719,239 |

Throughout the briefing of their contentions, both parties have cited as precedent judicial and regulatory cases that involved transportation by modes other then motor carrier. The various modes involve distinctions in the statutory framework, differences in carrier operations, and differences in regulatory objectives that diminishes the value of

---

62. *See, e.g.,* DTMR 32–25(a); *Jet Forwarding, Inc. v. United States,* 194 Ct.Cl. 343, 437 F.2d 987, 993–94 (1971); *Container Transport Int'l, Inc. v. United States,* 194 Ct.Cl. 320, 437 F.2d 1365, 1371 (1971); *Cargo Carriers, Inc. v. United States,* 34 Fed.Cl. 634, 637 (1995).

63. 49 U.S.C. § 11706(g).

64. 49 U.S.C. § 10721(b)(2); MFTRP No. 1A Sec. 1, Item 5, No. 2, Page 9—Issued May 1, 1989, 3d Rev.—issued Nov. 22, 1991, 4th Rev.—issued Oct. 19, 1992; MT Form 364–R Standard Tender for Freight Services, Part II, 1986, 1989, 1991 issues.

65. Computerized accounting that used electronic punch cards to show price changes have long been an aspect of DOD standard tenders. *See Container Transport, Int'l,* 437 F.2d at 1368.

66. *Jet Forwarding, Inc.,* 437 F.2d at 989.

67. *Baggett Transp. Co. v. United States,* 969 F.2d 1028, 1029 (Fed.Cir.1992).

68. *Campbell "66" Express, Inc. v. United States,* 157 Ct.Cl. 365, 302 F.2d 270 (1962); *McLean Trucking Co. v. United States,* 181 Ct.Cl. 170, 387 F.2d 657 (1967).

citations that involve modes other than motor carriers. Case law applicable to other modes is of little value in resolution of the motor common carrier transportation contracts that involve the DOD tenders in the representative claims.[69]

The shipments in the representative claims were procured in a program authorized in DOD regulations that established the relevant command structure, and defined its authority. The Defense Traffic Management Regulation, July 31, 1986, provides the Departments of the Army, Navy, Air Force and Defense Logistics Agency with procedures to be followed for transportation procurement and traffic management. Each service uses the DTMR in its own regulations.[70] It prescribes policies and procedures and assigns responsibilities for performing freight and passenger traffic functions within CONUS. It applies to CONUS freight movements initiated or sponsored by DOD, including:

 a. DOD Foreign Military Sales Program shipments.

 b. Military Assistance Program shipments.

 c. Contractor (vendor) shipments.

 d. Shipments in support of Federal Civil Agencies.[71]

The Secretary of Defense designated the Secretary of the Army as single manager for military traffic, land transportation, and common-user ocean terminals. The Secretary of the Army established the MTMC as the single manager operating agency for military traffic, land transportation, and common-user ocean terminals.[72]

General traffic management policies include:

 a. The means of transportation selected will be that which will meet DOD requirements satisfactorily at the lowest overall cost from origin to final known destination (in or outside of CONUS).[73]

The MTMC commander is responsible for determination of proper freight classifications, rates, charges, rules and regulations on DOD traffic, and for negotiating with all commercial for hire carriers to establish or modify rates, classification descriptions and ratings, charges, rules, regulations or accessorial freight services on DOD traffic. Negotiations involving freight services incidental to a line haul transportation movement require solicitation of rates and charges for performance of transportation alone. Negotiations with commercial carriers include receipt on behalf of shipper services all negotiated and voluntary (unsolicited) tenders relative to rates included in the line haul charge of service, and other adjustments or charges.[74]

The MTMC commander is responsible for prescribing administrative procedures regarding the use of bills of lading for the procurement of commercial transportation services on behalf of DOD.[75] GBLs are required for all line haul movements by commercial carriers for which the Government is responsible for payment of transportation charges directly to the carrier concerned.[76]

Rules and accessorial services governing the movement of DOD freight traffic by motor carrier are contained in MTMC MFTRP No. 1A. This publication was issued May 1, 1987, with an effective date of July 1, 1987.[77]

**69.** This problem had been recognized and similarly resolved by the ICC. *See ICC Ex Parte No. MC –182,* Jan. 28, 1987, p. 3; *United States DOD v. Interstate Storage,* 353 ICC 397, 404 (1977).

**70.** Army–AR 55–355; Navy–NAV SUPINST 4600.70; Air Force–AFR 75–2; Marine Corps–MCO P4600.14B; Defense Logistics Agency–DLAR 4500.3.

**71.** DTMR, Sec. 1–1.

**72.** DTMR, Sec. 2–1.

**73.** DTMR, Sec. 3–1a.

**74.** DTMR, Sec. 12–1a(3) and (9).

**75.** DTMR, Sec. 32–2.

**76.** DTMR, Sec. 32–8. There is an exception for carrier BLs; it is not applicable to the representative shipments.

**77.** Plaintiff on Feb. 26, 1996, filed MFTRP No. 1A as Exhibit D on which the first sheet was marked "1st Revised Title Page," issued May 1, 1989, effective June 1, 1989, and bore the notation: "This issue of MFTRP 1A is a consolidation of all original and revised pages listed on the check sheet of pages." Original page 7 (Section 1—General Application and Instructions) shows it was issued May 1, 1987, effective July 1, 1987. Plaintiff's Exhibit D contains pages 1 through 141. Page 1, check sheet of pages, which shows

The purpose of MFTRP No. 1A is to articulate the motor transportation service needs of DOD for the movement of its freight traffic; to ensure that motor freight carriers providing that transportation have both the willingness and the capability to meet those needs; and to provide the standardization necessary for achieving a fully automated system for routing DOD freight traffic.[78]

The rules and accessorial charges contained in MFTRP No. IA govern the freight services of all motor freight carriers doing business with DOD, except for rates and services covering the movement of

> bulk commodities which require tank truck service;
>
> vehicles moving in driveway/towaway service;
>
> privately-owned mobile homes;
>
> shipments moving in courier or package express service;
>
> foreign military sales shipments; and
>
> perishable subsistence shipments.

The rules and accessorial charges apply to DOD shipments in intrastate commerce and shipments from, to, or between those points in CONUS, and from, to, or between points in CONUS and points in Alaska and/or Canada which are specified in the individual DOD Standard Tenders of Freight Service (tenders), MT Form 364–R. MFTRP No. IA must be shown as a governing publication in Section B of the tender in order for the tender to be considered for DOD routing. Tenders may not be made subject to any other publication for application of the rates and charges therein.[79]

Tenders are voluntary and unsolicited. MFTRP No. 1A is not designed for guaranteed traffic solicitations, or other specifically publicized MTMC programs and solicitations. When the rules, regulations, charges or other provisions of the specific solicitation differ from or conflict with the provisions of MFTRP No. 1A, the provisions of the other solicitation will apply as to those specific movements.[80]

MFTRP No. 1A contains sections 1 through 5. General operational rules, contained in Section 3, apply to all motor carriers subject to the publication. MFTRP No. 1A is to be used solely in conjunction with the DOD Standard Tender of Freight Services (tender), MT Form 364–R, except as otherwise provided. In order to be considered for DOD routing, carriers subject to this publication must show MFTRP No. 1A as a governing publication in Section B of their tenders.[81] Section 4 contains special rules in Parts A through D. Part A, contains special rules governing the movement of ammunition, explosives, fireworks and chemical munitions (Classes A, B, and C), classified material, radioactive materials, and other dangerous articles. Section 3 includes pages 37 through 82; Section 4, Parts A through D, includes pages 83 through 132.

Section 3, General Rules, contained in Items 50 through 250, define the meaning and content of the terms to be included in the tenders carriers are required to file. The items are complex. They provide precise information in specific detail. The items establish applicable policies. Items are designed on the basis of line-haul shipments, and reflect a policy that the tenders will produce the lowest charge to the DOD.[82]

---

the number of revisions applicable to each page, was issued Jan. 31, 1994, effective Dec. 20, 1993. Each page shows original or revision number, issue date and effective date. Revisions 1 through 6 were issued during the period May 1, 1989, through Oct. 19, 1992. Other than pages 1 and 2, no page had more than six revisions.

**78.** MFTRP No. 1A, page 9, item 5, paragraph 1.

**79.** MFTRP No. 1A, page 9, item 5, paragraph 2. MFTRP No. 1A references, and includes as part of its publication, but not listed in Section B of the tender form, seven industry publications: National Motor Freight Classification (NMFC), NMFT, Assn.; Mileage Guide No. 15; ATA Haz-

ardous Materials (American Trucking Assn.); MIMC Class Rate Pub. No. 100 series; Continental Directory of Standard Point Location Codes (SPLC); Directory of Standard Multi–Model Carriers and Tariff Agents Codes; CCTV Guidelines (U.S.Army).

**80.** Page 10, item 5, paragraph 3.

**81.** Page 10, item 10, paragraph 1; Page 11, item 10, paragraph 2.

**82.** See, e.g., Item 60, alternation of rates—DOD tenders (not applicable to guaranteed traffic tenders), paragraphs 3 and 4; Item 100, return of

Pursuant to the 1986 DTMR and the 1989 MFTRP No. 1A, MTMC issued instructions for the preparation and use of tenders of freight service. Instructions were issued on October 1, 1986, a revision, effective June 1, 1989, and a revision effective May 1, 1991. The 1989 revision applies to the tenders in representative claims A–50, A–396 and B–3; the 1991 revision applies to the remaining representative claims. Both revisions utilize a standard form authorized by MTMC, which is designated: "MT Form 364–R (Revised Aug. 1988)." For convenience, the form to which the instructions in the 1989 and 1991 revisions apply, will be referenced sometimes simply as MT Form 364–R.

On April 25, 1989, all motor freight carriers were notified by letter from MTMC of revised instructions for implementing tenders on MT Form 364–R (Revised August 1988) to implement MFTRP No. 1A. The letter listed as highlights six changes contained in the instructions for completing MT Form 364–R. To this end, the letter identified additional means for publishing rates, indicating services, and special equipment, as well as the impact on existing tenders that were issued under the format that expired June 30, 1988, and established a final cut-off date of June 1, 1989. The carriers were advised to use extreme care in the preparation of the new standard tender for freight service because of the many changes in format. Particular attention was directed to changes in Item 11. This highlight stated:

Also, intrastate point-to-point and territorial rates are limited to one state per tender, and in item 11, the space provided for EXPORT/IMPORT has no further application and will not be used. *ALL TENDERS WILL BE CONSIDERED INTERSTATE OR INTRASTATE IN APPLICATION.* [Emphasis in original.]

Plaintiff acknowledges it received this letter. Plaintiff also admits that each of the tenders applicable to shipments in the representative cases cited MFTRP No. 1A as the governing publication in Section B of the tenders.

MT Form 364–R, in the revisions effective June 1, 1989, and May 1, 1991, is organized under five parts:

Part I    Application

Part II   General Instructions

Part III  Special Instructions

Part IV   Submitting Different Rate Sections in One Tender

Part V    Specific Instructions for Form Completion

In application, the MT Form 364–R format must be used by all motor carriers, pipeline carriers, rail carriers, surface freight forwarders, shipper associations and shipper agents. Excluded from the tender format are foreign military sales shipments, international government bills of lading shipments, courier package express shipments, and shipments of privately owned mobile homes or privately owned vehicles. The standard tender format applies to both interstate and intrastate transportation, including transportation between Canada and the United States, but it does not apply to Hawaii or Puerto Rico. Tenders submitted in response to MTMC guaranteed traffic programs, Commerce Business Daily solicitations, or other negotiated actions should be published in the standard tender format, unless the specific solicitation or negotiated action provide other instructions.

The general instructions in Part II state MT Form 364–R is designed to offer transportation services and prices to DOD. The form provides a standard means to accomplish an offer in a manner which insures equitable consideration of all carriers offering their services. Data contained in the format must be shown in the disciplined fields provided for each section. Tenders that omit required data and/or contain special annotations or exceptions data will be returned without action. The general instructions include procedures for providing additional pages without issuing a new tender, assistance for loading the tender format on carrier's computers, and instructions on

empty trailers; Item 132 Loading—Unloading by Carrier; Item 165, pickup and delivery, paragraphs 1 and 2; Item 178, protective tarping for

security purposes, note 2; Item 180, reconsignment or diversion, paragraph 3; Item 185, redelivery, paragraph 6.

insertion of the standard carrier alpha code (SCAC).

Part III provides special format instructions, including instructions that standard point location codes (SPLC) are those determined in the SPLC Continental Directory issued by the National Motor Freight Traffic Association, Inc. All origin and destination points to be used in compiling a tender must be taken from the SPLC directory.

The specific instructions for completion of MT Form 364–R, Part V, is organized in Sections A through F, each with multiple items which occupy pages 5 through 26. The sections cover in minute detail information as to mode of service offered by a carrier, general terms and conditions of the carrier's offer, point to point rate quotes, rate tables,[83] intrastate point to point rates, territorial rates (with Tables A through F), state to state rate matrix, and security and accessorial services.

The 1989 revision of instructions for use of MT Form 364–R, Part V, Sec. A, paragraph 11, contained the following:

11. If a tender applies to interstate shipments, indicate by placing an "X" in the appropriate space. Interstate tenders will not contain any intrastate rates. If the tender applies to intrastate shipments, insert the U.S. Postal Service Standard State Abbreviation in the space provided. Intrastate tenders will not contain any interstate rates. Only one state per tender is permitted. *The space provided for EX-PORT/IMPORT has no application and will not be used.* Tenders 001000, 002000, and 003000 will apply to both interstate and intrastate tenders issued by the same

carrier, regardless of the application on these tenders.[84] [Emphasis in original.]

Clearly, the DOD policies applicable to the voluntary program, and the volume of information required to be contained in the carrier's offer, establish that without a tender, a carrier would not be eligible to participate in and could not obtain shipments from DOD. The carrier's tender is an essential element of every DOD contract in the voluntary program. A carrier's rate tender constitutes a continuing offer to ship goods in accordance with the provisions of the tender.[85]

The shipments in the 13 representative claims, as a group, contain elements that establish plaintiff participated in the DOD voluntary program established in DTMR, MFTRP No. 1A and the 1989 and 1991 revisions of instructions for MT Form 364–R. These elements are:

● TSMT published a tender that applied to the shipment,[86]

A GBL was issued for each shipment,

On each shipment, the shipper loaded and the consignee unloaded,

TSMT provided nothing but transportation service on each shipment,

● The property transported in each shipment was DOD military property for military uses,[87]

● Each involved line-haul transport from point to point within a State or from a point in one State to a point in another State,

● TSMT internal work orders and billing documents relative to each shipment referred to the TSMT tender,

● TSMT's application for payment was based on a MT Form 364–R tender and the

---

83. All rates are to be regressive—a carrier may not offer the same rate or a higher rate for a higher minimum weight, volume, or quantity. Part V, Sec. D, paragraph 7.

84. Part V, Sec. A, paragraph 11 in the 1991 revision is substantially the same. Tenders "004000 and 007000" were added in the final sentence and the words "indicated in Item 11, Section A." were substituted for "on these tenders."

85. *C & H Transp. Co. v. United States,* 193 Ct.Cl. 872, 436 F.2d 480, 481 (1971).

86. In their supplemental information, contrary to instructions, neither party analyzed provisions in the applicable tender that specifically applied to the shipment involved. GSA, however, in its audit established that the provisions of the tender on which payment was made specifically applied to the particular shipment.

87. Seven were shipments of Class A or Class B explosives: A–5, A–6, A–50, A–135, A–176, A–243, and B–10. The other shipments were for a military water distributor vehicle (A–81), FAK (A–191, A–204, B–3), and military small arms (A–287, C–1).

payment made was based on a MT Form 364–R tender.

■ Throughout this proceeding, plaintiff has taken the position that the MT Form 364–R tenders it filed with the DOD, with copies to the ICC, did not apply to the shipments involved in the claims made in special procedure dockets, Nos. 94–347C, 94–450C, and 95–705C. As a result, plaintiff contends, the absence of an applicable tender to DOD justifies and requires imposition of the higher rates in freight tariffs filed with the ICC that apply to interstate and foreign commerce. Plaintiff emphasizes that "the full applicable commercial rate" applies to shipments for the government when the MT Form 364–R tender does not apply. Plaintiff asserts its tenders do not apply because the limitation to "interstate" or "intrastate" transportation prevented their application to shipments in "foreign commerce," a concept that plaintiff equates with export/import. Plaintiff, therefore, sees the GBL and the ICC tariff as the only documents that define the transportation contract and the only documents that are relevant to the shipment.

Plaintiff's analysis of the transportation contracts made with DOD is flawed. It fails to account for the administrative structure that DOD uses to obtain contracts for transportation services in its programs, one of which is the voluntary program for spot shipments, and the policies and the procedures that apply to selection of a particular motor freight common carrier in the voluntary program. Plaintiff's analysis also fails to take into account or to recognize the regulatory background of the requirement that the government shall pay "the full applicable commercial rate" for its transportation services.

DOD commanders have authority over transportation arrangements within the geographical areas outside CONUS for which they are responsible. The DTMR prescribes policies and procedures, and assigns responsibilities, for performing traffic management within CONUS. International traffic between CONUS and other geographical areas

is coordinated in the MTMC Directorate of International Traffic. MT Form 364–R tenders were not used by motor freight common carriers for foreign military sales shipments or for international government bills of lading shipments.[88]

The voluntary tender program applies to shipments on individual GBLs between two points in CONUS, or between two points in a state. Motor freight common carriers that had submitted MT Form 364–R tenders were subject to consideration by transportation officers for activation of the tender by issuance of a GBL. The advertising requirements of 41 U.S.C. § 5 do not apply to the voluntary tender program. The lowest cost carrier, as determined by comparison of the tenders, that can provide the necessary service, is selected and, after availability is acknowledged, the GBL is prepared and issued. The tender and the GBL evidence the terms of the transportation contract. The GBL includes the special rates authorized in the tender. Once the motor freight carrier delivers the shipment to the point in the CONUS named in the GBL, frequently to an MTMC terminal, the contract is completed. The motor freight carrier does not perform any service to ready the cargo for an overseas movement, and future transportation, if any, is the responsibility of MTMC or other DOD personnel.

A motor freight carrier, when it picks up a shipment or delivers a shipment under a MT Form 364–R tender activated by a GBL, has not participated in, nor in any way contributed to, any prior movement of the freight to the pickup point, or to any subsequent onward movement from the delivery point. Such prior or subsequent movements, and the intent of the government, are not part of the transportation contract.

The provision in 49 U.S.C. § 10721 that provides the government shall pay "the full applicable commercial rate" is derived from a background of common carrier regulation by the ICC. This language prohibits discriminatory treatment of shippers, including the

---

88. Through transportation service is defined as transportation of DOD cargo from a CONUS origination point to an overseas destination point involving a transportation mode or service that

provides for through carriage under a single document, which includes MSC contracts, shipping agreements or through GBLs. DTMR Chap. 18, Sec. 1, Item 18–3 c.

government as a shipper, and is subject to the restriction in the phrase "Except as provided in this section." A carrier is prohibited to charge the government a rate higher than a rate contained in its ICC tariffs that applies to other shippers. ICC regulatory concepts and requirements for published tariffs do not apply to the MTMC voluntary tender program authorized in 49 U.S.C. § 10721(b)(1) unless the tender specifically so provides.[89]

In its brief after the April 1997 pretrial conference, plaintiff identified, as the first issue to be resolved, "whether tariff rates can *ever* apply to government shipments." [Emphasis in the original]. Plaintiff continued that in the event that the court ruled tariffs did not apply in this case, there is no factual or legal dispute between the parties regarding what particular tenders apply to the shipments, or what amounts are due or owing plaintiff.

The second legal issue to be resolved was identified as whether a common carrier transporting shipments for the government solely within CONUS could ever be considered as engaging in "foreign commerce." Plaintiff continued that the issue of whether the government can ever ship cargo in foreign commerce subject to the ICC's jurisdiction and to the requirement that it pay tariff rates for such shipments is a purely legal issue, and if as a matter of law the shipment could not be transported in foreign commerce, that judgment must be entered against plaintiff "without regard to the particular facts surrounding each shipment."

Plaintiff contends there is no need to examine the particular facts surrounding each shipment because its "entire case depends upon the proposition that the government shipments in this case were in foreign, as opposed to interstate or intrastate, commerce." From this posture, plaintiff continues that particular facts underlying each shipment need be examined only if the court agrees that the government can sometimes

deliver shipments to common carriers destined to be transported in foreign commerce.

The logical sequence in plaintiff's analysis embodies elements known to be erroneous. Plaintiff's prior briefs, filed May 1, 1995, and December 16, 1996, addressed statutes, case precedents and provisions in the tenders and tariffs that provide examples where tenders may include tariff rates that can apply to government shipments. Such examples include reference to provisions of DTMR that define its application to CONUS freight movements, and to export routing under DTMR, Chapter 18, Sec. 1, paragraphs 18-1, 18-3, through 18-6. In effect, plaintiff's analysis erects a fiction that is designed to obscure the need to examine the documents that establish the facts that apply to the representative shipments.

■ Perspective on the MT Form 364–R tenders involved in the representative claims is provided through an examination of tenders that relate to other DOD transportation programs. Application of special government rates could be denied and use of ICC tariffs could be used, according to the operative facts of a particular situation.

● The government is not entitled to reduced rates where tenders and GBLs involve the domestic leg of transportation of explosives to foreign countries under foreign military sales contracts authorized by the Arms Export Control Act. In such contracts the shipments are primarily for the benefit of the foreign country and the shipments did not meet the statutory criterion that the transportation must be "for the United States Government." The Section 22 lower rates were held to apply only when a direct and substantial pecuniary benefit flows to the United States Government.[90]

● Published ICC tariff rates apply in a situation where MTMC returned the tender for correction of the publications listed, and the carrier corrected the tender by writing in ink the word "tender" next to referenced ICC publications.[91]

**89.** *See* analysis in *Jetco, Inc. v. United States,* 11 Cl.Ct. 837, 840 n. 4, 844–46 (1987).

**90.** *Baggett Transp. Co. v. United States,* 229 Ct.Cl. 428, 670 F.2d 1011, 1013 (1982). Arms Export

Control Act, then at 22 U.S.C. § 2751, et seq. (1976).

**91.** *Pennco Trucking, Inc. v. United States,* 20 Cl. Ct. 534, 538 (1990).

In a situation where a solicitation by MTMC and the DLA produced tenders from a number of carriers, from which plaintiff and others were selected for a Perishable Subsistence Carrier Rate Tender and Service Agreement, the resulting agreement was a conventional requirements contract. The contract reserved for defendant the right to designate a new distribution point and other modifications, and reserved an option for the government to resolicit tenders. The court distinguished the legal effect of GBLs that were issued in the voluntary program that applies to one-time spot movements.[92]

● In special programs relating to shipments of military household goods, unaccompanied baggage shipments, and exclusive use service for transporting freight between destinations in the United States, the terms of the program solicitation and resulting negotiations control interpretation of the resulting contract. Decision is determined by analysis of applicable regulations in the context of particular facts.[93]

Plaintiff relies upon statutes and regulations that permit payment before audit and correction of error in initial billings [94] to justify its claim to payment of ICC tariff rates after it was paid the rates established in its tenders. Plaintiff points to the corrections made in eight of the 13 representative claims to remove errors in tenders listed on the GBLs to support the further contention that tariff rates should apply because MTMC did not allow the tenders to include export/import rates. When MT Form 364–R tenders are essential elements of the contracts that comprise the voluntary spot movements program, correction of a tender number does not establish that ICC tariffs apply. Plaintiff has not established that MTMC did not have authority to solicit tenders for DOD which do not include export/import rates. Nor does plaintiff deny that it submitted valid tenders

that offered rates for interstate and intrastate transportation contracts.

Plaintiff failed to include export/import rates in its tenders. If that was plaintiff's intent, it should have made its tenders subject to such condition. Plaintiff did not include such rates because it recognized to do so would remove it from the zone of eligibility for selection in the voluntary program. Plaintiff's tenders admittedly apply to interstate or to intrastate point to point transportation. Plaintiff is responsible for the plain meaning of its tenders.

■ It is fundamental that the government, if there is a valid tender, is entitled to the rate that is lower than ICC tariff rates that apply to administrative regulation of commercial business or to government business not included in the tender. Imposition of higher tariff rates for point to point service, when in fact there is a valid applicable tender, would negate contracts authorized in 49 U.S.C. § 10721(b)(1). Plaintiff would secure an undeserved windfall that is not within the scope of the contract that plaintiff actively sought.

Docket No. 94–450C contains a Count IV, which alleges defendant was reimbursed by certain foreign governments for freight transportation charges in some of the shipments. Plaintiff alleges tenders under Section 10721 are not applicable to shipments when the transportation charges are reimbursed by a foreign government. Count IV is contained in docket No 94–450C amendments five, filed April 4, 1995, through fifteen, filed February 2 1996.

The question of whether the Count IV allegation should be permitted by amendment to the complaint arose in both docket No. 94–347C and docket No. 94–450C. In both dockets, defendant opposed amendments to the complaint and, in the alternative moved to dismiss Count IV in the amended

---

**92.** *A–Transport Northwest Co. v. United States,* 36 F.3d 1576, 1582–84 (Fed.Cir.1994).

**93.** *See A Olympic Forwarder, Inc. v. United States,* 33 Fed.Cl. 514 (1995) (decision for carrier); *Cargo Carriers, Inc. v. United States,* 34 Fed. Cl. 634, 643 (1995) (decision for carrier); *Jet Forwarding, Inc.,* 437 F.2d at 991–92 (decision

for Government); *Container Transport Int'l, Inc.,* 437 F.2d at 1367 (GAO audit upheld, neither party entitled to recover, plaintiff's complaint and defendant's counterclaims dismissed).

**94.** 31 U.S.C. § 3726(a), and 41 C.F.R. § 101–601(a).

complaints under RCFC 12(b)(4). Initially, defendant's opposition to the Count IV amendment prevailed and on May 5, 1995 Count IV was stricken from both dockets on the ground that it involved a new issue that had not been included in the special procedures applicable to these dockets. Subsequently, after a telephone conference with counsel on May 18, 1995, the status of Count IV in each docket was clarified: Count IV continued to be excluded from docket No. 94–347C; it was permitted to be included in docket No. 94–450C. On February 9, 1996, after the 15th amended complaint had been filed, it was concluded that the status of docket No. 94–450C should remain in status quo and that the special procedure would continue in docket No. 94–347C on the claims in Counts I, II and III.

Briefing in the cross-motions for summary judgment in docket No. 94–347C do not address the reimbursement allegations of Count IV. In addition to discovery issues, there are issues concerning the legal content of the words "for the United States Government" in Section 10721(b)(1) that have not been illuminated. In docket No. 94–450C, Count IV is intermixed and confused with allegations in Counts I, II and III. For that reason, on final order, Count IV will be given separate treatment.

On August 21, 1997, defendant filed a motion for leave to file a sur-reply pursuant to the briefing schedule established in the April 11, 1997, order. The motion attached defendant's sur-reply. On September 4, 1997, plaintiff filed an opposition that included assertions a sur-reply had not been authorized by the briefing schedule, and time enlargement was not justified. Defendant has not filed a reply to plaintiff's opposition.

The sur-reply contains sections I through V, in 16 pages. Sections I through III, pages 1 to 10, contain matters that have been addressed in prior issues, and had been briefed in this case. Section IV and V contains new material applicable to the issue of whether the tenders on the freight bills that differed from the GBL tenders involve a certification of a false claim. The false claim issue was explored to some extent in the parties' briefs filed in response to the April

11, 1997, order. Delineation and development of the false claim issue in the special procedure on the three dockets, however, would greatly extend the time and effort already devoted to the issues of regulation of transportation services. Any further development of whether the continued assertion of claims for payment involved false claims should be separated from the special procedure in these three dockets.

Inasmuch as the false claims matter was within the scope of the April 11, 1997, order, defendant's motion for leave to file is allowed. The scope of defendant's Section IV and V in the motion papers has not been explored, and is separate from the ruling on transportation issues in the final order.

## CONCLUSION

1. Defendant's cross-motion for summary judgment is allowed; plaintiff's motion for summary judgment is denied.

2. The Clerk is directed to dismiss docket No. 94–347C, and the remaining Count II in docket No. 95 –705C.

3. In Docket No. 94–450C, the Clerk is directed to dismiss Counts I, II and III with prejudice and to dismiss Count IV without prejudice.

4. Defendant shall have its costs.

## APPENDIX A

Special Procedures applicable to Docket Nos. 94–347C, 94–450C and 95–705C

Phase I May 26, 1994—December 7, 1994

Party Documents: *No. 94–347C,*

Complaint, filed May 26, 1994

First Amended Complaint, filed June 20, 1994

Carriers Request for Admission of Facts (App. C), filed June 20, 1994,

With Lists of Carriers Bills in Dispute: A claims 1–252, B claims I–11, C claims 1 (App. C, Schedule (G)(1))

Exhibit 1: DOD Instructions—MT Form 364–R, 1 October 1986 (14 pages)

Exhibit 2: DOD Instructions—MT Form 364–R, June 1, 1989 (26 pages)

Exhibit 3: DOD Instructions—MT Form 364–R, May 1, 1991 (29 pages) And Bill of Lading Detail and computation of charges App. C Schedules (G)(2) and (G)(3)(i) in 3 volumes.

Defendant's Answer (Partial), filed September 19, 1994

Defendant's Responses to Plaintiffs' Request for Admission of Facts (Partial), filed September 19, 1994

Party Documents: *No. 94–450C:*

Complaint, filed July 12, 1994

Carrier's Request for Admission of Facts, filed August 9, 1994

With Lists of Carriers Bills in Dispute: A claims 253–398, B claims 12–14, C claim No. 2, (App. C Schedule G–1)

Exhibit 1: DOD Instructions—MT Form 364–R—Oct. 1, 1986 (14 pages)

Exhibit 2: DOD Instructions—MT Form 364–R—Jan. 1, 1989 (26 pages)

Exhibit 3: DOD Instructions—MT Form 364–R—May 1, 1991 (29 pages) And Bills of Lading Detail and computation of charges App. C, Schedules (G)(2) and (G)(3)(i) in 2 volumes

Court Orders:

August 11, 1994

September 9, 1994

December 7, 1994

Phase II December 30, 1994—May 26, 1995

Party Documents: *No. 94–347C*

Joint Stipulation of Authenticity, filed December 30, 1994, With Exhibits 1 through 15 (first page of TSMT Tenders to DOD)

Exhibit 16 TSMT Tender No. 300 to DOD as a sample complete tender, contains 27 un-numbered sheets

Plaintiff's Motion for Partial Summary Judgment, filed January 25, 1995

Plaintiff's Proposed Findings of Uncontroverted Fact, filed January 25, 1995, With Exhibit I GBL summary, Exhibits 2 through 5—TSMT ICC Tariffs.

Defendant's Opposition to Plaintiff's Motion and Defendant's Cross–Motion For Summary Judgment, filed March 31, 1995, With Appendix relative to five TSMT GBL's—pp. 4–34

Defendant's Proposed Findings of Uncontroverted Fact, filed March 31, 1995

Defendant's Statement of Genuine Issues, filed March 31, 1995

Plaintiff's Reply to Defendant's Opposition and Plaintiff's Opposition to Defendant's Cross–Motion, filed May 1, 1995, With Appendices A through F, *pp. 1—107*

Plaintiff's Statement of Genuine Issues, filed May 1, 1995

Plaintiff's Supplemental Proposed Findings of Uncontroverted Fact, filed May 5, 1995, With Exhibits 2 through 5—certified copies of four TSMT ICC Tariffs.

Defendant's Reply to Plaintiff's Opposition to Defendant's Cross Motion for Summary Judgment, filed May 26, 1995, With Supplemental Appendix—pp. 37–48

Court Orders:

May 5, 1995 No. 94–347C

May 5, 1995 No. 94–450C

May 18, 1995 No. 94–347C and 94–450C

Phase III May 26, 1995 to January 23, 1996

Court Orders: No. 94–347C

June 15, 1995

November 2, 1995

November 22, 1995

December 21, 1995 No. 95–705C

Oral Argument—November 21, 1995 Transcript Filed December 18, 1995

Party Document:

Joint Statement of Recommendations, filed January 23, 1996

Party Documents: *No. 95–705C*

Complaint, filed October 26, 1995

Carrier's Request for Admission of Facts as to Count I, (App. C) With Exhibits I through 5

Phase IV February 9, 1996 to February 4, 1997

Court Orders:

February 9, 1996 Nos. 94–347C, 9445, 95–705C

July 19, 1996 No. 94–347C

Party Documents: *No. 94–347C*

Carrier's Second Request for Admission of Facts, filed February 26, 1996

Carrier's Schedule Claim for Transportation of Property, filed February 26, 1996

Exhibits to Plaintiff's Second Request for Admission of Facts, Vol. I— MRTRP—No. IA effective June 1, 1989;

Vol. II—DTMR—31 July 1986, Vol. III, IV—Tenders, filed February 26, 1996

Defendant's Responses to Carrier's Second Request for Admission of Facts, filed April 29, 1996

Defendant's Submission in Accordance with Appendix C, II, ¶¶ 8 & 9, filed August 16, 1996

Joint Stipulation of Facts, filed November 15, 1996, with Exhibit A: ICC TSMT 100A

Memorandum of Plaintiff Submitted Pursuant to February 9, 1996, order, ¶ 2(e), filed December 16, 1996

Plaintiff's Final Proposed Findings of Uncontroverted Fact, filed December 16, 1996

Defendant's Supplemental Memorandum, filed December 16, 1996; referencing defendant's proposed finding of uncontroverted fact, filed March 31, 1995

Defendant's Statement of Genuine Issues, filed January 13, 1997

Defendant's Final Proposed Findings of Uncontroverted Fact, filed January 27, 1997

Plaintiff's Final Statement of Genuine Issues, filed February 4, 1997

Phase V April 11, 1997 to August 25, 1997

Orders: No. 94–347C

Pre–Trial Conference Order—April 11, 1997

Order on 49 U.S.C. § 10721(b)(2)—August 15, 1997

Party Documents: *No. 94–347C*

Carrier's Supplemental Schedule Claim for Transportation of Property, filed May 21, 1997, With Exhibits relative to 13 representative claims

Second Supplemental Memorandum of Plaintiff, filed May 21, 1997, With Exhibits A through I

Defendant's Brief Relative to Facts Material to Defendant's Cross Motion For Summary Judgment, filed June 26, 1997

Defendant's Appendix with Exhibits 1 through 7, filed June 26, 1997

Plaintiff's Reply Brief, filed July 24, 1997

Plaintiff's Memorandum, filed August 25 1997

Defendant's Memorandum, filed August 25, 1997

Party Documents: *No 95–705C*

Defendant's Answer re Count I, filed July 9, 1996

Defendant's Response to Plaintiff's Request for Admission of Facts (App. C), filed July 9, 1996

Court Orders: No. 95–705C

September 23, 1996

October 16, 1996

Count I—dismissed by stipulation

Count II—stayed pending disposition of No. 94–347C and 94–450C

APPENDIX B

The February 9, 1996, order directed the parties to file in docket No. 94–347C, "any stipulation as to the amounts due to plaintiff as a result of the [GSA] audit, and as to any additional facts highlighted in the November 22, 1995, order." The July 19, 1996, order provided that the truth of matters of fact relied upon by plaintiff in the second RAF, as to which defendant denied with the asser-

tion such matters of fact were not material, "is deemed to be admitted."

The joint stipulation of facts filed on November 15, 1996, included in Exhibit Nos. 10–22 and their subsections, facts specifically applicable to shipments in the 13 representative claims. The facts in those exhibits are accepted. The following description of shipments in the representative claims, based on Exhibits 10–22, the joint stipulation and related documents, are not in dispute.

*Claim A–5*

a. This claim involves the terms of GBL D–1,121,162. The shipper is the Transportation Officer at Military Ocean Terminal, Sunny Point (MOT), Southport, N.C. The consignee is the Transportation Officer, Savannah Army Depot Activity, Savanna, IL. Block 15, "Marks and Annotations," includes: Dual Driver Protective Service Requested, DDD (desired delivery date): May 6, 1991. Block 18, "Description of Articles," includes: Rocket Ammunition with Explosive Projectile, Class A Explosive, (Return of Desert Storm Freight), Vessel: Anangel Leader. Continuation sheet No. 2 includes: Shipper to Load Consignee to Unload; This equipment must not be transported in trip leased equipment; Deadhead mileage authorized from Savanna, IL. to MOT, Southport, N.C. Block 20, "Tariff/Special Rate Authority," designates TSMT 0417 (Tender 417).

b. Prior to May 4, 1991, the United States caused to be transported in an ocean-going vessel "Anangel Leader," the shipment of Class A Explosives described in the GBL from a destination in a foreign country to the MOT, Southport, N.C. The Anangel Leader at the time of the movement to the MOT was a commercially owned ocean-going vessel.

c. On May 4, 1991, the shipper loaded the shipment on Tri–State's motor carrier at the MOT. Tri–State transported the shipment from the MOT to the Savanna Army Depot Activity, Savanna, IL. The shipment was unloaded by the consignee on May 6, 1991.

d. Tri-State provided dual driver protective service for the shipment from the MOT to Savanna, IL and returned an empty trailer from Savanna, IL to Southport, N.C.

e. On May 10, 1991, Tri–State billed the Army Finance and Accounting Center for the shipment and return of empty trailer pursuant to Tender 417. The billing was on Standard Form (SF) 1113, which listed Alpha Prefix No. 437823 (TSMT's internal work order account number), and listed the GBL as the subvoucher. Tri–State requested and received payment of $2,879.17.

*Claim A–6*

a. This claim involves the terms of GBL D–1,121,159. The shipper is the Transportation Officer at MOT, Southport, N.C. The consignee is the Transportation Officer, Savannah Army Depot Activity, Savanna, IL. Block 15, "Marks and Annotations," includes: Dual Driver Protective Service Requested; DDD (desired delivery date): May 5, 1991. Block 18, "Description of Articles," includes: Rocket Ammunition with Explosive Projectile, Class A Explosive; (Return of Desert Storm Freight), Vessel: Anangel Leader. Continuation sheet No. 2 includes: Shipper to Load and Consignee to Unload; This shipment must not be transported in trip leased equipment; Deadhead mileage authorized from Savanna, IL to MOT, Southport, N.C. Block 20, "Tariff/Special Rate Authority," designates TSMT 0417 (Tender 417).

b. Prior to May 4, 1991, the United States caused to be transported in the ocean-going vessel Anangel Leader, the shipment of Class A Explosive described in the GBL from a destination in a foreign country to the MOT. The Anangel Leader at the time of the movement to MOT was a commercially-owned, ocean-going vessel.

c. The shipper loaded the Class A Explosive on Tri–State's motor carrier at the MOT. Tri–State transported the shipment from the MOT to the Savanna Army Depot

Activity, Savanna, IL. The shipment was unloaded by the consignee on May 6, 1991.

d. Tri–State provided dual driver protective service for the shipment from the MOT to Savanna, IL and returned an empty trailer from Savanna, IL to Southport, N.C.

e. On May 10, 1991, Tri–State billed the Army Finance and Accounting Center for the shipment and return of the empty trailer pursuant to Tender 417. The billing was on SF 1113, which listed Alpha Prefix No. 437817 (TSMT's internal work order account number), and listed the GBL as the subvoucher. Tri–State requested and received payment of $2,879.17.

*Claim A–50*

a. This claim involves the terms of GBL C–8,760,777. The shipper is the Transportation Officer, Naval Weapons Station, Concord, CA. The consignee is the Transportation Officer, Hawthorne Army Ammunition Plant, Hawthorne, NV. The GBL was prepared and issued on April 22, 1991. Block 15, "Marks and Annotations," includes: This GBL consists of 31 pages; DDD: April 25, 1991; Offload Leticia Lykes Retrograde Cargo/Import by Surface. Block 18, "Description of Articles and Exceptions," referenced Continuation sheet Nos. 2 through 31, which included, on even-numbered pages, shipping orders for 15 tractor/trailer loads, 42,660 lbs each, of Explosive Bombs, Class A Explosive, and, on odd-numbered pages, the same exceptions applicable to the shipment, which included: Dual Driver Protective Service Requested; Shipper to Load and Consignee to Unload; Signature and Tally Records; Substitute Service not to be Used. Block 20, "Tariff/Special Rate Authority," designates TSMT 0395 (Tender 395) MFTRP 1A.

b. Prior to April 23, 1991, the United States caused to be transported in the ocean-going vessel Leticia Lykes, the Class A Explosives described in the GBL from a destination in a foreign country or territory or possession of the United States to the Naval Weapons Station, Concord, CA. The Leticia Lykes, at the time of the movement to the Naval Weapons Station, was a commercially-owned, ocean-going vessel.

c. The shipper loaded the Class A Explosives at the Naval Weapons Station, Concord, CA pursuant to the shipping orders during the period, April 22–April 29, 1991. Tri–State transported the Class A Explosives from Concord, CA to Hawthorne, NV. The consignee unloaded the Class A Explosives at Hawthorne, NV during the period April 23– 30, 1991.

d. Tri–State provided dual driver protective service and complied with signature and tally record procedures.

e. On May 15, 1991, Tri–State billed the Army Finance and Accounting Center for 15 shipments pursuant to Tender 395. The billing was on SF 1113, which listed Alpha Prefix Nos. 434753, –55, –59, –801, –3, –4, –5, –6, –7; 435529, –31, –33, –34, –35; and 436255 (TSMT internal work order account numbers), each in the amount of $1,000, and listed the GBL as the subvoucher. Tri–State requested and received payment of $15,000.

*Claim A–81*

a. This claim involves the terms of GBL E–0,723,698. The shipper is the Transportation Officer, Naval Construction Battalion Center (Naval Center), Gulfport, MS. The consignee is CDR, MTMC (Military Traffic Management Command), Cape Canaveral, Cape Canaveral, FL. The GBL was prepared and issued on May 13, 1991. The carrier pickup date was May 13, 1991. Block 15, "Marks and Annotations," includes: For Export; POD: CK2–Roosevelt Roads, Puerto Rico. Block 18, "Description of Articles," includes: Vehicle, Freight; USN: 96–39275; Shipper to Load and Consignee to Unload; Tri–State's work order, attached to GBL, describes the shipment as water distributor vehicle. Block 20, "Tariff/Special Rate Authority," designates TSMT 0401 (Tender 401).

b. On May 13, 1991, the shipper loaded the vehicle on Tri–State's motor carrier at the Naval Center, Gulfport, MS. Tri–State transported the vehicle from the Naval Center to Cape Canaveral, FL. The shipment was received and unloaded by the consignee on May 14, 1991.

c. After May 13, 1991, the United States caused the vehicle to be transported to Roosevelt Roads, Puerto Rico.

d. On May 20, 1991, Tri–State billed the Naval Material Transportation Office pursuant to Tender 404, which was different from the tender number listed in Block 20 of the GBL. The billing was on SF 1113, which listed Alpha Prefix No. 439980 (TSMT internal work order account number), and listed the GBL as the subvoucher. Tri–State requested and received payment of $1,130.91.

*Claim A–135*

a. This claim involves the terms of GBL D–1,121,247. The shipper is the Transportation Officer at MOT, Southport, N.C. The consignee is the Transportation Officer, Savannah Army Depot Activity, Savanna, IL. The GBL, was prepared and issued May 4, 1991. Block 15, "Marks and Annotations," includes: Dual Driver Protective Service Requested; DDD: May 20, 1991. Block 18, "Description of Articles," includes: Rocket Ammunition with Explosive Projectile Class A Explosive; MF: W52G2K (Return of Desert Storm Freight) Vessel: Anangel Leader. Continuation sheet, (GBL, p. 2) includes: Shipper to Load and Consignee to Unload; This shipment must not be transported in trip leased equipment; Deadhead mileage authorized from Savanna, IL. to MOT, Southport, N.C. Block 20, "Tariff/Special Rate Authority," designates TSMT 0417 (Tender 417).

b. Prior to May 19, 1991, the United States caused to be transported in the ocean-going vessel "Anangel Leader," the Class A Explosives described in the GBL from a destination in a foreign country to the MOT, Southport, N.C. The Anangel Leader, at the time of the movement to the MOT, was a commercially-owned, ocean-going vessel.

c. On May 19, 1991, the shipper loaded the shipment on Tri–State's motor carrier at the MOT. Tri–State transported the shipment from the MOT to the Savanna Army Depot Activity, Savanna, IL. The shipment was unloaded at Savanna AD, Savanna, IL by the consignee on May 20, 1991.

d. Tri–State provided dual driver protective service for the shipment from the MOT to Savanna, IL and returned an empty trailer from Savanna IL to Southport, N.C.

e. On May 28, 1991, Tri–State billed the Army Finance and Accounting Center for the shipment pursuant to Tender 450, which was different from the tender number listed in Block 20 of the GBL. The billing was on SF 1113, which listed Alpha Prefix No. 441060 (TSMT internal work order account number), and listed the GBL as the subvoucher. Tri–State requested and received payment of $2,879.17.

*Claim A–176*

a. This claim involves the terms of GBL D–1,261,420. The shipper is LTV Missiles & Electric Group, Highland Ind. Park, (LTV), E. Camden, AR. LTV is a contractor or supplier of the United States. The consignee is the Transportation Officer, Naval Weapons Station, Concord, CA. The consignor was DCASMA—Dallas, Dallas, TX. The GBL was prepared and issued April 16, 1991. The carrier pickup date was April 18, 1991. Block 15, "Marks and Annotations," includes: RDD (Required Delivery Date): April 23, 1991; Vessel: Leslie Lykes, Voyage Number: AC84Voyage P4249; Dual Driver Protective Service Requested; Protective Tarping for Security Service Requested. Tarp Service Charge: $100. Block 18, "Description of Articles," references Continuation sheets 2 and 3. Page 2 described a shipment of 166,400 pounds of Rocket Ammunition with Explosive Projectile, Class A Explosives, to be loaded on four flatbed trailers (identified

by number), each carrying 41,600 pounds. Page 3, exceptions applicable to the shipment, includes: Tarps Required; Dual Driver Protective Service Requested; Signature and Tally Record Furnished; Shipper to Load, Consignee to Unload; This shipment must not be transported in trip leased equipment; Designated route loaded trailers must follow. Block 20, "Tariff/Special Rate Authority," designates TSMT 0552 (Tender 552).

b. On April 18 and April 22, 1991, the shipper, at the direction of the United States, loaded the shipment on four Tri–State flatbed trailers at E. Camden, AR. Tri–State transported the shipment from E. Camden, AR to the Naval Weapons Station, Concord, CA. The shipment was unloaded at the Naval Weapons Station by the consignee.

c. Tri–State provided dual driver protective service for the shipments from E. Camden, AR to Concord, CA. TSMT provided four expendable security tarpaulins.

d. After April 23, 1991, the United States caused the shipments to be transported from the Naval Weapons Station, Concord, CA in the ocean-going vessel Leslie Lykes, to a foreign country, territory, or possession of the United States. The Leslie Lykes, at the time of the movement from Concord, CA, was a commercially-owned, ocean-going vessel.

e. On June 3, 1991, Tri–State billed the Army Finance and Accounting Center for the GBL shipment pursuant to Tender 416, which was different from the tender number listed in Block 20 of the GBL. The billing was on SF 1113, which listed Alpha Prefix Nos. 432795, –878 and 433762, –770 (TSMT internal work order account numbers), each in the amount of $3,930.95, and listed the GBL as the subvoucher. Tri–State requested and received payment of $15,723.80.

*Claim A–191*

a. This claim involves the terms of GBL D–1690230. The shipper is Gomex and Associates, Inc. (Gomex), 9801 Highway 78,

Ladson, SC. Gomex is a contractor or supplier of the United States. The consignee was the Portsmouth Marine Terminal, Portsmouth, VA. The GBL was prepared and issued on June 1, 1991. The carrier pickup date was June 15, 1991. Block 15, "Marks and Annotations," includes: M/F: For Export/AU 2 Keflavik, Iceland. Block 18, "Description of Articles and Exceptions" includes: Freight All Kinds; Shipper to Load Consignee to Unload; Carrier must prelodge shipment by 1100 hours on workday preceding delivery; Container Nos. RJF 024 & RAB 086. Block 20, "Tariff/Special Rate Authority," designates TSMT 401 (Tender 401).

b. On June 15, 1991, the shipper, at the direction of the United States, loaded container Nos. RJF 024 and RAB 086 at Ladson, SC. Tri–State transported the shipment from Ladson SC. to the Portsmouth Marine Terminal, Portsmouth, VA. The containers were unloaded by the consignee at the Portsmouth Marine Terminal.

c. After June 15, 1991, the United States caused the shipment to be transported from the Portsmouth Marine Terminal to Keflavik, Iceland.

d. On June 25, 1991, Tri–State billed the Army Finance and Accounting Center, Indianapolis, IN pursuant to Tri–State Tender No. 452, which was different from the tender number listed in Block 20 of the GBL. The billing was on SF 1113, which listed Alpha Prefix No. 448670 (TSMT internal work order account number), and listed the GBL as the subvoucher. Tri–State requested and received payment of $700.

*Claim A–204*

a. This claim involves the terms of GBL E–1078693. The shipper is the Transportation Officer, Indiana Army Ammunition Plant, Charlestown, IN. The consignee is the Transportation Officer, Dover Air Force Base, Dover, DE. The GBL was prepared and issued by the Indiana Army Ammunition Plant, Charlestown, IN on May 22, 1991. Carrier pickup

date was May 23, 1991. Block 15, "Marks and Annotations," includes: DDD: May 28, 1991; TPI for Export to W81TSA, KKMC 111 Ordnance Grp King Khalid Military City, SA; Shipper to load and Consignee to unload. Block 18, "Description of Articles and Exceptions," includes: Freight All Kinds (Container Metal PA 116 W/M 831 Inserts); Total Cube: 1260. Block 20, "Tariff/Special Rate Authority," designates "TSMT 0396 Tender Eff. Nov. 9, 1990" (Tender 396).

b. On May 23, 1991, the shipper loaded 24 empty containers on Tri–State's motor carrier at Charlestown, IN. Tri–State transported the shipment from Charlestown, IN to Dover Air Force Base, Dover, DE. The empty containers were unloaded by the consignee at Dover Air Force Base.

c. After May 23, 1991, the United States caused the shipment to be transported by air from the Dover Air Force Base, Dover, DE, to King Khalid Military City, in Saudi Arabia.

d. On June 5, 1991, Tri–State billed the Army Finance and Accounting Center pursuant to Tender 396. The billing was on SF 1113, which listed Alpha Prefix No. 442275 (TSMT internal work order account number), and listed the GBL as the subvoucher. Tri–State requested and received payment of $903.15.

*Claim A–237*

a. This claim involves the terms of GBL E–1029809. The shipper is Anniston Army Depot, Anniston, AL. The consignee is Military Ocean Terminal, Bay Area, Oakland Army Base, Oakland, CA. The GBL was prepared and issued by the Anniston Army Depot on June 4, 1991. The carrier pickup date was May 4, 1991. Block 15, "Marks and Annotations," includes: For Export; TP 1; DDD: June 11, 1991. Block 18, "Description of Articles," includes: This GBL consists of 4 sheets, see page 2 for special instructions. Continuation sheet No. 2 includes: Shipper Load—Consignee Unload;

Armed Guard Surveillance Requested, Exclusive Use of Vehicle Requested; Signature and Tally Record Furnished Carrier; Dromedary Service Requested; Exclusive Use of Container Requested. Continuation sheet No. 3 includes: Guns, NOI, Bore under 6 in. N MTD, 1 Pallet of 4 Bx Each CU 39. Block 20, "Tariff/Special Rate Authority," designates TSMT 0340 (Tender 340).

b. On June 4, 1991, the shipper loaded Tri–State's motor carrier at the Anniston Army Depot. Tri–State transported the shipment in a 410 container from the Anniston Army Depot to the Military Ocean Terminal, Oakland, CA. The shipment was unloaded by the consignee at the Military Ocean Terminal.

c. Tri-State provided armed guard surveillance and exclusive use of the vehicle for the shipment.

d. After June 4, 1991, the Government caused the shipment to be transported from the Military Ocean Terminal, Oakland, CA to a foreign country or territory or possession of the United States.

e. On June 19, 1991, Tri–State billed the Army Finance and Accounting Center, Indianapolis, IN, pursuant to Tri–State Tender No. 432, which was different from the tender number on the GBL. The billing was on SF 1113, which listed Alpha Prefix No. 445314 (TSMT internal work order account number), and listed the GBL, as the subvoucher. Tri–State requested and received payment of $3,441.60.

*Claim A–243*

a. This claim involves the terms of GBL C–9,457,068. The shipper is TMO (Traffic Management Officer), Charleston Air Force Base, SC. The consignee is Transportation Officer, Picatinny Arsenal, NJ. The GBL was prepared and issued by the TMO, Charleston Air Force Base, SC on May 30, 1991. The carrier's pickup date was May 30, 1991. Block 15, "Marks and Annotations," includes: DDD: June 4, 1991; MF: W15BD/Imported by Air. Block 18, "Description of Articles and Exceptions," in-

cludes: Ammunition for Cannon with Explosive Projectile Class A Explosive; See Continuation sheet for Shipping Instructions. Continuation sheet No. 2, includes: Dual Driver Protective Service Requested, Signature and Tally Record Requested; Dromedary Service Requested; Shipper to Load and Consignee to Unload; Shipment must not be transported in trip leased equipment. Block 20, "Tariff/Special Rate Autl Authority" designates TSMT 0475 (Tender 475) Eff. 5/22/91.

b. Prior to May 30, 1991, the United States caused to be transported by air the shipment of Class A Explosives from a destination in a foreign country or territory or possession of the United States to Charleston Air Force Base, Charleston, SC.

c. On May 30, 1991, the shipper loaded the Class A Ammo on Tri–State's motor carrier at Charleston Air Force Base, SC. Tri–State transported the shipment in a dromedary container from Charleston Air Force Base to Picatinny Arsenal, Dover, NJ. The consignee unloaded the Class A Ammo at Picatinny Arsenal, Dover, NJ on June 8, 1991.

d. Tri–State provided dual driver protective service and exclusive use service for the shipment from Charleston, SC to Picatinny Arsenal, Dover, NJ.

e. On June 11, 1991, Tri–State billed the Army Finance and Accounting Center pursuant to Tender 475. The billing was on SF 1113, which listed Alpha Prefix No. 444438 (TSMT internal work order account number), and listed the GBL as the subvoucher. Tri–State requested and requested payment of $470.

*Claim B–3*

a. This claim involves the terms of GBL E–1132177. The shipper is the Sierra Army Depot, Herlong, CA. The consignee is the Transportation Officer, MTMC Military Ocean Terminal, Bay Area, Oakland Army Base, CA. The GBL was prepared and issued by the Transportation Officer, Sierra Army Depot, on February 23, 1991. The Carrier Pickup Date was May 25, 1991. Block 15, "Marks and Annotations," includes: MF FK5250; 3 DK–SA 3 for Export; DDD: May 28, 1991; Carrier Must Prelodge 48 hours Prior to Attempting Delivery. Block 17, "Description of Articles and Exceptions," references page 2 for Special Instructions. Continuation sheet No. 2 includes: Shipper to Load and Consignee to Unload; For Export; Freight All Kinds; 4 packages, Total Weight: 2,500 pounds. Block 20, "Tariff/Special Rate Authority," designates TSMT 0260 (Tender 260).

b. On May 25, 1991, the shipper loaded the FAK shipment on Tri–State's motor carrier at the Sierra Army Depot, Herlong, CA. Tri–State transported the shipment from the Sierra Army Depot to the Oakland Army Base, Oakland, CA. The consignee unloaded the shipment at Oakland Army Base. Tri–State prearranged the schedule for arrival for unloading.

c. After May 25, 1991, the Government caused the shipment to be transported from the Oakland Army Base, Oakland, CA to a foreign country or territory or possession of the United States.

d. On June 19, 1991, Tri–State billed the Army Finance and Accounting Center pursuant to Tri–State Tender No. 340, which was different from the tender number on the GBL. The billing was on SF 1113, which listed Alpha Prefix No. 441875 (Tri–State's internal work order account number), and listed the GBL as the subvoucher. Tri–State requested and received payment of $475.

*Claim B–10*

a. This claim involves the terms of GBL C–8,760,987. The shipper is the Transportation Officer, Naval Weapons Station, Concord, CA. The consignee is the Receiving Officer, Naval Weapons Station, Fallbrook, CA. The GBL was prepared and issued by the shipper on May 17, 1991; the carrier's pickup date was May 17, 1991. Block 15, "Marks and Annotations," includes: TP/3 Imported by Surface Offload Neptune Peridot; GBL consists of 17 pages. Block 18, "Description

of Articles," includes: Class A and B Explosives as shown on pages 2 through [17]. Continuation sheets with even numbers describe eight loads as Ammunition for Cannon with Explosive Projectile Class A Explosive, or Propellant Explosive Solid, Class B Explosive. These Continuation sheets include weight per load, date driver signed, and date consignee unloaded. Continuation sheets with odd numbers contain the same exceptions applicable to each load. They include: Dual Driver Protective Service Requested; Signature and Tally Records Requested; Shipper to Load and Consignee to Unload; Substitute Service not to be Used; Motor Surveillance Service Requested; Shipment must not be transported in trip leased equipment. Block 20, "Tariff/Special Rate Authority" designates MFTRP 1A TSMT 0319 (Tender 319).

b. During the period May 22 through June 10, 1991, the shipper loaded eight of Tri–State's motor carriers with ammunition at the Naval Weapons Station, Concord, CA. Tri–State transported the eight loads from Concord, CA to the Naval Weapons Station, Fallbrook, CA. During the period May 24 through June 11, the consignee unloaded the ammunition on Tri–State's motor carriers at Fallbrook, CA. Tri–State provided dual driver protective service and motor surveillance service, and complied with signature and tally records.

c. Prior to May 17, 1991, the Government caused to be transported in the ocean-going vessel Neptune Peridot, the eight loads of Class A and B Explosives described in the GBL from a foreign country or territory or possession of the United States to the Naval Weapons Station, Concord, CA. The vessel Neptune Peridot was, at the time of the movements, a commercially-owned, ocean-going vessel.

d. On June 19, 1991, Tri–State billed the Marine Corps Logistics Base, Albany, GA, pursuant to Tri–State Tender No. 421, which was different from the tender number on the GBL. The billing was on SF 1113, which listed Alpha Prefix Nos. 439069, 441621, –855, –864, 445596, –599, –600, –601 (TSMT internal work order account numbers), and listed the GBL as the subvoucher. Tri–State requested and received payment of $10,092.80.

*Claim C–1*

a. This claim involves the terms of GBL C–9,719,239. The shipper is the Transportation Officer, Naval Weapons Station, Concord, CA. The consignee is the Receiving Office, Oakland Army Base, Oakland, CA. The GBL was prepared and issued on June 11, 1991, at Concord, CA. Block 25, "Carrier Pickup Date," identifies June 11, 1991. Block 15, "Marks and Annotations," includes: TP–1; RDD: 189; This GBL consists of 4 pages. Block 18, "Description of Articles," identifies the shipment as Class C explosives/FAK (Freight All Kinds) and references the attached continuation sheets. Continuation sheet No. 2 identifies the shipment as Class C small arms ammunition, Class C Explosives, by cartridge type, or as FAK. Some parts of the small arms ammo in the shipment were marked: FFT: SA 3 Subic Bay—M/F USS Shasta, FFT: SA3 Subic Bay RP MIF USS Coronado; FFT: SA 3 Subic Bay RP; and FFT: XE1 Oahu, Hawaii. The FAK was marked FFT: XE 1 Lualualei, Hawaii. Continuation sheet No. 4, limitations applicable to the shipment include: Shipper to Load and Consignee to Unload; Dual Driver Protective Service Requested; Signature and Tally Record Requested; and Substitute Service Not to be Used. Block 20, "Tariff/Special Rate Authority," designates TSMT 0260 (Tender 260) MFTRP–1A.

b. On June 11, 1991, the shipper loaded the shipment of Class C Small Arms Ammo and FAK on Tri–State's motor carrier, at the Naval Weapons Station, Concord, CA. Tri–State transported the shipment from Concord, CA to the Military Ocean Terminal, Oakland, CA. The consignee unloaded the shipment Oakland, CA. Tri–State provided dual driver protective services for the shipment.

c. After June 14, 1991, the Government caused portions of the shipment to be transported by ocean-going vessel from the Military Ocean Terminal, Oakland CA to Subic Bay in the Philippines, and portions of the shipment to be transported by ocean-going vessel, to Hawaii.

d. On June 26, 1991, Tri–State billed the Naval Material Transportation Office, Norfolk, VA, pursuant to Tri–State Tender 421, which was different from the tender number on the GBL. The billing was on SF 1113, which listed Alpha Prefix No. 447342 (TSMT internal work order account number), and listed the GBL as the subvoucher. Tri–State requested and received payment of $650.

Mark E. Bohe, Seattle, WA, for plaintiffs.

Benjamin C. King, Jr., with whom were Assistant Attorney General Loretta C. Argrett, Chief, Court of Federal Claims Section, Mildred Seidman, and Assistant Chief Terry Coles, Department of Justice, Washington, DC, for defendant.